## Huddleston v. Commonwealth.

(Decided Sept. 29, 1933.)

S. A. CARY for appellant.

BAILEY P. WOOTTON, Attorney General, and WILLIAM R. ATTKISSON, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY HOBSON, COMMISSIONER— Affirming.

Homer Huddleston, Dennis Short, and Cam Scott were indicted in the Cumberland circuit court for the willful murder of Bill Short. The prosecution was dismissed by the commonwealth as to Dennis Short and Cam Scott. It then came on for trial as to Homer Huddleston; he was found guilty; and his punishment was fixed at imprisonment for life. He appeals.

It is insisted for appellant that the evidence is not sufficient to sustain a conviction. Dennis Short and Cam Scott testified on the trial for the commonwealth, and it is insisted that their evidence was not sufficiently corroborated to warrant a conviction under section 241 of the Criminal Code of Practice, which provides that a conviction cannot be had upon the testimony of an accomplice, unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely shows that the offense was committed and the circumstances thereof. This objection requires a statement of the facts shown by the evidence.

Wash Huddleston and Bill Short were two old men living not very far apart in Cumberland county. Homer Huddleston was the son of Wash Huddleston. He had some children but no wife, and was living at the home

of Hunter Short, a son of Bill Short, who had married his sister and lived about three-fourths of a mile from Bill Short. Bill Short's wife had died, and Cam Scott was living with him. On May 29, 1932, Bill Short and others were at the home of Hunter Short, and that evening they put flowers upon the grave of Mrs. Bill Short. When they were gathering these flowers, Dennis Short, a son of Hunter Short, asked for one of the roses and stuck it on the front of his coat. When the sun was about a half hour high, Homer Huddleston and Dennis Short left the home of Hunter Short, and went out to a distillery operated by Homer Huddleston and got some whisky, and drank of it. They then went to the home of Bill Short, and there met Cam Scott, and the three were drinking together when Bill Short came up from Hunter Short's, having left there about a half hour after they left. Dennis Short and Cam Scott were young men about twenty years of age. Both testified that Bill Short told Cam Scott to let down the bars for the cows to come in, and, while Cam was doing this, Homer Huddleston drew his pistol and shot Bill Short twice besides firing other shots at him, and then proceeded to open his clothes and take off his person his money bag. They say that Homer then told them to say nothing about it, and the three left the body lying there in the road near the house and went to the home of Wash Huddleston, reaching there about 9 o'clock and staying there all night, sleeping in the same bed without taking their clothes off. The next morning a neighbor saw the body of Bill Short lying in the road. Notice was given, and an inquest was held.

In addition to the testimony of Dennis Short and Cam Scott as to how the shooting occurred, the commonwealth proved these facts: The two balls entered the chest of Bill Short and passed out at his back. They caused his death. A neighbor testifies to hearing two shots and then others. One of the balls was found there on the rock where the deceased had fallen. It was a ball from a .38 pistol. Dennis Short had a .38 pistol, and this was missing from his father's house after the shooting. The rose which Dennis Short had put in his coat the evening before, or one just like it, was found near the body. Bill Short had sold a farm not long before, and had received money for it. In his wife's lifetime she had made him a bag in which he carried

his money attached to the belt, which he wore under his clothes. It was known in the neighborhood that he had three or four thousand dollars. When the body was found, the belt and bag were missing; his trousers had been cut open; and, in addition to the pistol wounds, he had been cut several times with a knife. About two or three weeks before the homicide, Homer Huddleston said to John Riley that he was going to follow his children to hell or have them; that he knew where $2,500 or more was; the man who had it was too stingy to spend it, and he was going to have some money; just let the damn birds whistle as lonesome as they want to.

Verna Capps testifies that on the evening after her father's body was found she was at the house. Homer was there, and motioned to Cam Scott to go with him, and they walked out to the place where the body was found on the road. They stopped at some lilac bushes, and she stepped in the back of the bushes and heard Homer say to Scott, "We are all right if they don't find that gun, but if they find that gun we are blowed up."

Herschel Riddle, who testified to hearing the shots about 800 yards from his house along about dark, also testified that he heard three men talking as they passed his house soon afterwards.

Charley Blythe testified that on the day after the killing Homer Huddleston sowed peas in one of his fields, and later in this field where Homer Huddleston had plowed the officers dug up the money bag of Bill Short and some papers that had been on his person and also part of the belt which he had worn under his clothes to hold the money bag. The belt had been cut in two places.

On the other hand, Homer Huddleston testified that he and Dennis Short left Hunter Short's together and went to his father's, Wash Huddleston, and went to bed; that Dennis was drinking and went on, and that he did not know where he went, and he did not know anything of the homicide until he was told about it the next day.

The evidence for the commonwealth, outside of the testimony of Dennis Short and Cam Scott, was sufficient to show that Bill Short had been murdered. The condition of the corpse and the clothing, in view of the evidence as to deceased's habit of carrying his money

in the bag attached to the belt under his trousers, was sufficient to show prima facie that he had been robbed as well as killed. It has been several times held by this court that, where a robbery is committed, the fact that the defendant is found in possession of the stolen property is sufficient corroboration of the testimony of an accomplice to take the case to the jury. Gordon v. Commonwealth, 190 Ky. 172, 227 S. W. 144; Shuttles v. Commonwealth, 190 Ky. 176, 227 S. W. 154; Harper v. Commonwealth, 211 Ky. 346, 277 S. W. 457. In this case the bag in which the deceased carried his money and the belt with which he fastened it to his person were found where defendant had plowed them under the ground, and this proof is certainly no less than proof that the thing stolen was found in the possession of the defendant, for covering up the evidence of a crime is always a potent evidence of guilt. In addition to this, we have the proof of appellants taking the boy Cam Scott away to talk to him and saying, "We are all right if they don't find that gun, but if they find that gun we are blowed up." It cannot be said, therefore, that the corroboration here merely showed that the offense was committed and the circumstances thereof. Clearly the above testimony tended to connect the defendant with the commission of the offense.

The verdict of the jury was supported by the evidence. The weight of the evidence entirely overthrow's the defendant's testimony that he went to his father's from Hunter Short's and did not go elsewhere. The weight of the evidence clearly shows that all three of them came to his father's house about 9 o'clock at night and all went to bed in their clothes.

The objection of the defendant to the testimony against him by John Riley, as to what he had said two or three weeks before the homicide, was properly overruled. The evidence was competent to show motive, and was not too remote, although he did not mention the name of the man that had the money he referred to. to.

When Hunter Short was on the witness stand, this occurred:

"Q. Since your father was murdered had anybody come to you and offered to sell these notes to you? A. Yes, sir.

"Q. Who was that? A. Charley Harlan."
Recross-examination by attorney for defendant:

"Q. Was that in the presence of Homer Huddleston? A. No, sir.

"Mr. Cary: Object to that.

"Court: That is not competent for any purpose and the jury needn't consider it."

Nothing more was said about this matter at that time. But, after all the evidence in the case had been introduced, the defendant, at the close of the testimony, moved the court to discharge the jury because these questions had been asked in their presence. The court properly overruled the motion entered then. It will be observed that there was no objection to the questions when they were asked, and no objection was made until it was shown that the defendant was not present, and then the court sustained the objection and told the jury not to consider the matter. It must be presumed that the jury followed the admonition of the court. The matter was not alluded to again before them, and there was nothing in the questions connecting the defendant in any way with Charley Harlan or what he had done. The motion to discharge the jury was therefore properly overruled.

Martin Rowe was a witness for the defendant. He had brought bloodhounds to the scene about 8 o'clock the night after the homicide, and had attempted to make them follow the tracks leaving there. He was asked if he saw a track up through the woods which had certain tacks in the end of the toe. The court excluded the testimony on the ground that there was no proof showing when these tracks were made, and that many persons had been around there after the homicide. There was an exception to the ruling of the court, but there was no avowal as to what the witness would state, and the rule is well settled that the refusal of the court to allow a certain question to be answered is not ground for reversal, unless there be an avowal of what the witness would have stated, for otherwise the court cannot know that the substantial rights of the defendant were prejudiced by the refusal of the court to allow the questions answered. On the whole case, also, it is very clear that the defendant's substantial rights were not prejudiced here; for the court allowed as much of

the testimony as was material to be given. The discretion of the court on a subject like this will not be ground for reversal, unless abused.

On the whole case, the court finds in the record no error of the court below affecting the substantial rights of the defendant.

Judgment affirmed.