**Adrian BOYD, Appellant**

v.

**COMMONWEALTH of Kentucky, Appellee.**

No. 2013–SC–000146–MR.

Supreme Court of Kentucky.

Aug. 21, 2014.

John Gerhart Landon, Counsel for Appellant.

Jack Conway, Attorney General, James Hayes Lawson, Assistant Attorney General, Counsel for Appellee.

Opinion of the Court by Justice KELLER.

Adrian Boyd (Boyd) appeals as a matter of right from a judgment of the Hart Circuit Court convicting him of burglary in

the first degree, assault in the fourth degree, and for being a persistent felony offender in the first degree and sentencing him to a total of twenty years' imprisonment.

As grounds for relief Boyd contends that the trial court erred by: (1) refusing to dismiss the entire jury venire after prejudicial statements by a prospective juror; (2) allowing the narration of security footage by witnesses; (3) allowing testimony by a police officer mentioning Boyd's previous arrest; (4) allowing inadmissible, speculative hearsay regarding Boyd; and (5) improperly finding Boyd to be a persistent felony offender in the first degree.

For the reasons stated below, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Dwight Faulkner (Faulkner) resides in a single-family home in Horse Cave, Kentucky. Several years ago, Faulkner installed motion-activated security cameras inside and outside his home, when his father, who suffered from Alzheimer's disease, was living with him. After his father moved, Faulkner continued to operate the security cameras.

On May 3, 2012, Faulkner and Brandi Richardson (Richardson) were cleaning Faulkner's home. LaShauna Wells (Wells), an acquaintance of Faulkner's, arrived at Faulkner's home and left the door open. Shortly thereafter, two men followed Wells inside and assaulted Faulkner. Faulkner reported the assault to the Hart County Sheriff's Office several hours later. Ultimately, Boyd and Demarcus Clayton (Clayton) were arrested and charged with assault and burglary. Wells was also ar-

rested and charged with complicity to both assault and burglary.

Boyd and Wells were tried together and, as noted above, the jury convicted Boyd of burglary in the first degree, assault in the fourth degree, and for being a persistent felony offender in the first degree. The jury convicted Wells of complicity to burglary in the first degree and complicity to assault in the second degree.[1]

We set forth additional facts as necessary below.

## II. STANDARD OF REVIEW

Boyd raises several issues, both preserved and unpreserved. The standard of review for preserved evidentiary errors is abuse of discretion. Abuse of discretion occurs when the trial court's decision in allowing or disallowing the introduction of evidence was arbitrary, unreasonable, unfair or unsupported by sound legal principles. *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky.1999); (citing 5 Am. Jur.2d *Appellate Review* § 695 (1995)). Additionally, preserved errors can be reviewed under the harmless error standard. "A non-constitutional evidentiary error may be deemed harmless ... if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error." *Winstead v. Commonwealth*, 283 S.W.3d 678, 688–89 (Ky. 2009).

We review unpreserved errors for palpable error. RCr 10.26. Palpable error affects the substantial rights of the party and results in manifest injustice. Furthermore, an appellant claiming palpable error must show that the error was more likely than ordinary error to have

---

**1.** Clayton pled guilty and received a two-year sentence; he was not a defendant in this trial, though he did testify.

affected the jury. *Ernst v. Commonwealth*, 160 S.W.3d 744, 758 (Ky.2005).

We set forth any additional standards of review as necessary below.

## III. ANALYSIS

### A. Prejudicial Statements by a Prospective Juror.

During *voir dire*, a prospective juror, Mr. N [2], stated:

> Well I think if you go out and kill five, six people and wound fifteen or twenty and you ain't insane and go to prison the rest of your life; that ain't right. Why should you go in there and eat three meals a day, watch TV, lift weights, whatever you want to do, sitting in the pen? I think they outta bring hanging back.

Amid laughter from the rest of the venire, Wells moved to strike the juror for cause and Boyd moved to excuse the entire venire. The judge declined to dismiss the entire venire, but called Mr. N to the bench, and asked him several questions. The judge then dismissed Mr. N and admonished the rest of the venire thusly:

> Let me admonish the jury now. Mr. [N] undoubtedly said what he felt like he needed to say, but I have excused him for today, but not for the whole time. But I want to admonish you to not consider anything that he said as any part of your deliberations in this case, whether it's the guilt or innocence phase, or the punishment phase if we get to that point.

The judge then asked if Mr. N's answer affected any of the jurors; no jurors indicated that it had.

Boyd contends that this outburst should have prompted the judge to dismiss the entire venire instead of issuing an admonition. We disagree.

The trial court has broad discretion in determining whether a jury venire should be dismissed, and its ruling should not be disturbed absent a clear abuse of discretion. *Thompson v. Commonwealth*, 862 S.W.2d 871, 874 (Ky.1993). Furthermore, proper admonitions are presumed to be a legally sufficient remedy, and absent a showing of actual prejudice, there is a presumption that the jury follows such an admonition. *Maxie v. Commonwealth*, 82 S.W.3d 860 (Ky.2002) (Citing *Alexander v. Commonwealth*, 862 S.W.2d 856, 859 (Ky. 1993), *overruled on other grounds in Stringer v. Commonwealth*, 956 S.W.2d 883 (Ky.1997)).

The judge in this case not only admonished the venire not to consider Mr. N's statements immediately after his outburst, but also asked the jurors whether the outburst affected them. Furthermore, the judge similarly admonished the final jury panel. There is nothing to suggest the admonition was ineffective or to suggest the judge acted in an arbitrary or unreasonable manner. Therefore, we cannot say the judge abused his discretion.

### B. Security Video Narration.

The night of the assault, Faulkner invited Richardson to clean his house. Richardson arrived at approximately 1 a.m. At 3 a.m., Richardson was folding clothing in the sitting room, where the monitors for Faulkner's security cameras were located. Wells arrived at the house, and Faulkner answered the door. During this time, Richardson noticed two men "skulking around" outside the house. When Richardson saw the men enter the house, she ran upstairs and hid. After the men en-

---

**2.** Neither of the parties provided the name of the prospective juror. After a review of the record, it appears the juror's name begins with an N, thus we identify him by that initial.

tered the house, Wells ran out, and the men beat Faulkner unconscious and left. Richardson returned downstairs after the men left, and cleaned the blood off of Faulkner. When Faulkner awoke, he and Richardson examined the security footage and used Facebook to help them identify the two assailants.

During trial, both Faulkner and Richardson testified to the existence of the security footage. They then narrated the footage for the jury. Richardson identified the two assailants and narrated the events she witnessed in real time, and those that took place after she had run for cover. Faulkner narrated footage from before he was aware of the intruders and after he had been knocked unconscious.[3]

Boyd alleges three errors in regard to the narration: first, that *any* narration by Faulkner and Richardson is improper; second, that the specific narration about events that Faulkner and Richardson did not see in real time was improper; and third, that the identification of the assailants by Richardson was improper. The narration and identification are separate issues and we address them independently. The objection to Richardson's testimony is preserved; however, the objection to Faulkner's testimony is not. Therefore, we examine Richardson's testimony under the abuse of discretion standard and Faulkner's testimony under the palpable error standard.

### 1. Faulkner and Richardson's Narration.

In *Morgan v. Commonwealth*, 421 S.W.3d 388 (Ky.2014), this court held that Kentucky Rules of Evidence (KRE) 602 and 701 govern the admissibility of narrative testimony. KRE 602 limits testimony to matters within the personal knowledge of the witness, while KRE 701 further limits testimony by a lay witness to matters, "a) rationally based on the perception of the witness; [and] b) helpful to a clear understanding of the witnesses' testimony or demonstration of a fact in issue." Accordingly, narration of a video may be proper but only if it is comprised of opinions and inferences that are rationally based on the witnesses' own perceptions of which he had personal knowledge and that are helpful to the jury. Furthermore, witnesses are limited to a description of events when narrating video footage and any interpretation of that footage is improper. *Cuzick v. Commonwealth*, 276 S.W.3d 260, 265–66 (Ky.2009).

We established in *Morgan* that narration of video footage is permissible under certain circumstances, and improper when the witnesses interpret the footage or offer an opinion. *Morgan*, 421 S.W.3d at 388. Faulkner and Richardson did not interpret the footage, nor did they offer their opinion on the subject. Faulkner and Richardson merely narrated the events as they occurred and did not testify to anything that the jury could not see for themselves. Thus, the trial court did not commit error in allowing narrative testimony regarding events perceived in real time by Faulkner and Richardson.

However, Faulkner and Richardson both testified to events that they

---

**3.** While the testimony of both Faulkner and Richardson is part of the record, the security footage itself is not. It is exceedingly difficult to determine which parts of the video Faulkner and Richardson would have seen personally, and which they only had knowledge of from subsequently viewing the footage, without actually watching the security video. Thus, we rely on the parties' descriptions of the security video to determine which narration was improper based on a lack of personal knowledge. It would behoove the parties to include such critical pieces of evidence in the record, which would aid in our review.

did not perceive in real time. Those parts of the narration were violative of KRE 602 and 701, because the testimony exceeded the witnesses' personal knowledge of the events, and should not have been permitted. However, the error was harmless because the jurors were watching the video and were in a position to interpret the security footage independently from the testimony, which provides fair assurance that the judgment was not "substantially swayed by the error." *Winstead*, 283 S.W.3d at 688; See *Morgan*, 421 S.W.3d at 388.

### 2. Richardson's Identification.

■ In *Morgan*, we held that witnesses are permitted to make identifications through video evidence. *Morgan*, 421 S.W.3d at 392. KRE 602 and 701 permit identifications from photographs and videos, particularly when the witness is in a position to make an identification based on personal knowledge that is not available to the jury. *Id. See also United States v. White*, 639 F.3d 331, 336 (7th Cir.2011) (holding that a lay witness can testify regarding the identity of a person depicted in a photograph from a surveillance video "if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury").

■ Richardson testified that she was familiar with both Boyd, who is her ex-boyfriend, and Clayton, who is Boyd's cousin, thus she had personal knowledge of the individuals that she was identifying. She also testified that she knew the assailant was Boyd because of the way he stood and by what jacket he was wearing. This put her in a unique position to identify Boyd, which was helpful to the jurors who did not possess such knowledge of the assailants. Thus, because Richardson's identification of the assailants as Boyd and

Clayton was permissible under KRE 602 and KRE 701, there was no error.

### C. Officer Webb's Testimony

After Wells left Faulkner's house, she crashed her SUV. Wells and her children, who were in the car at the time, suffered minor injuries and a passerby drove them to the hospital. Officer Webb, an officer with the Horse Cave Police Department, responded to Wells's crash scene. While at the crash scene, Boyd and an unidentified man approached Officer Webb. Boyd indicated that the car was Wells's and that his children were inside. When Officer Webb told him that no one was found in the car, Boyd replied that he must have been mistaken and left the scene.

During trial, the Commonwealth's attorney asked Officer Webb if he was familiar with Boyd before the accident. Officer Webb responded; "Yes, I was familiar with him, I had arrested him." The Commonwealth's attorney interrupted Officer Webb before he could finish the sentence, and Wells's attorney asked the court for an admonition. The Commonwealth's attorney responded that he wasn't sure the jury had heard the statement. Wells's attorney agreed that drawing more attention to the matter might be unadvisable, and she withdrew her motion. Thus, the court did not give an admonition, and the trial continued.

■ Boyd contends that this testimony was: in violation of KRE 404(b); unduly prejudicial as evidence of a prior bad act; and requires reversal of his conviction. The Commonwealth argues that this issue is not preserved because of Boyd's failure to ask for an admonition. We agree with the Commonwealth.

■ The cure for accidental admission of prior bad acts is an admonition to the jury to disregard the testimony.

*Graves v. Commonwealth,* 17 S.W.3d 858 (Ky.2000) (citing *Huddleston v. Commonwealth,* 251 Ky. 172, 64 S.W.2d 450 (1933)). When an admonition is sufficient to cure an error and the defendant fails to ask for one, we will not review the error. *Lanham v. Commonwealth,* 171 S.W.3d 14, 28 (Ky.2005).

Boyd withdrew his request for an admonition as a strategic move to keep from highlighting the evidence to the jury. As stated in *Lanham,* we do not review an alleged error when an admonition is a sufficient cure, and the defendant, as herein, fails to request one.

### D. Faulkner's Testimony Regarding Wells's Phone Call.

■ The night of the assault, Wells called Faulkner's cell phone, asking to come over to his house.[4] Faulkner testified at trial that he knew that Wells was calling from Boyd's cell phone; Boyd objected to that evidence arguing it was based on speculation. The Commonwealth asked for permission to clarify the question. The judge conditionally overruled the objection and permitted the Commonwealth to proceed. Faulkner then testified that he received the phone call from a number he did not recognize, but that he knew the number to be Boyd's because Richardson recognized the number when he read it aloud to her. Boyd did not object to this subsequent testimony.

To the extent that we understand this argument, Boyd contends that the testimony was speculative and admitted in violation of KRE 701. The objection as to speculation is preserved, and examined for abuse of discretion. *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky.1999). While we agree that the initial testimony

was speculation and could have been stricken from the record, as set for below, any error was harmless for three reasons.

■ First, after Boyd's objection based on speculation, the Commonwealth "clarified" the question. Faulkner reiterated his testimony that the cell phone belonged to Boyd. Boyd did not object to this testimony, which contained hearsay, and has not asked us to review it on that ground. Therefore, Boyd waived his objection to its admission.

■ Second, Boyd contends that the testimony was speculative and in violation of KRE 701. KRE 701, as previously stated, prohibits witnesses from testifying to matters not within their personal knowledge. Faulkner had previously testified that he did not recognize the number of the phone from which Wells called. The subsequent testimony that the phone belonged to Boyd was outside of his personal knowledge, thus speculative and in violation of KRE 701. However, this evidence was then admitted through other means, specifically, Faulkner's testimony after Boyd's objection. Boyd did not object to the admission of the testimony, thus, as stated above, he waived any objection to its admission.

Third, Boyd objects to the testimony because Wells's use of his cell phone implied he had a relationship with Wells. However, there was no attempt by either Boyd or Wells to keep their relationship a secret. Wells, Faulkner, and Richardson all testified that Boyd and Wells had children in common, and that they had previously been in a romantic relationship. Wells further testified that Boyd was staying at her apartment the night of the

4. The testimony is conflicting as to why Wells was going to Faulkner's house that night. Wells contends it was to pick up drugs from Faulkner; Faulkner contends Wells was trying to sell him Wal-Mart gift cards.

assault. Even if Faulkner's speculative testimony regarding the phone call had been stricken from the record, there was an overwhelming amount of evidence linking Boyd and Wells. The jury was unlikely to consider Wells's use of Boyd's cell phone particularly shocking or to assign that piece of evidence any greater weight than they would assign to the other evidence that established the relationship between Boyd and Wells. Therefore, any error in allowing the testimony was harmless.

### E. First–Degree Persistent Felony Offender.

Boyd had, in pertinent part, been convicted of three felonies before the felony now on appeal.[5] On November 7, 2006, a Hart County grand jury indicted Boyd for his "first" felony (the Hart County felony). On April 3, 2007, the court sentenced Boyd to five years' imprisonment for the Hart County felony and probated that sentence. On July 12, 2006, Boyd was charged with his "second" felony in Barren County (the Barren County felony). On August 15, 2007, four months after Boyd was sentenced for the Hart County felony, three events occurred: (1) the Barren Circuit court sentenced Boyd to serve five years' imprisonment for the Barren County felony; (2) the Hart Circuit court revoked Boyd's probation for the Hart County felony; and (3) consistent with the Hart County felony sentence, Boyd was sentenced to serve the sentences for the Hart County and Barren County felonies concurrently. On October 2, 2007, less than three months

after receiving the concurrent sentences for the Hart County and Barren County felonies, the Barren Circuit court granted Boyd shock probation. On December 19, 2007, approximately two months after Boyd had been granted shock probation on the concurrent sentences for the Hart County and Barren County felonies, Boyd was charged with his third felony, which he committed in Warren County.[6] On January 7, 2008, Barren County revoked Boyd's shock probation and imposed the original five-year prison sentence. On May 27, 2008, Warren County sentenced Boyd to serve one year of imprisonment for the Warren County felony.[7]

The PFO statute, KRS 532.080, states that a defendant with two prior felony convictions may be found guilty of being a PFO in the first degree. KRS 532.080(2)–(3). For the purpose of PFO offenses, any felonies in which sentences are to be served concurrently, or uninterrupted, are considered one felony. *Id.*

Boyd argues that because he served the time before he was granted shock probation on the Hart County and Barren County felonies in county jail, the time served should not be considered "imprisonment" as articulated in KRS 532.080. Boyd also contends that the preceding evidence supports a conviction of being a persistent felony offender in the second-degree only, because all of his prior convictions were "served concurrently."

Boyd first argues that because he served time for the Hart County and Bar-

---

**5.** We list Boyd's felonies in order of the judgments of conviction and by county because that is the way the parties discuss them in their briefs. However, it appears from the record that Boyd committed the first felony in Barren County, the second felony in Hart County, and the third felony in Warren County.

**6.** It appears from the record that Boyd committed the Warren County felony less than three weeks after being shock probated on the Hart and Barren County felonies.

**7.** The final orders of conviction for the Hart, Barren and Warren County felonies were introduced as evidence during trial, but are not part of the record.

ren County felonies in county jail, he does not satisfy the elements of being a first-degree PFO, which requires "imprisonment." KRS 532.080(4). In support of that argument, Boyd cites to *Blades v. Commonwealth*, 339 S.W.3d 450, 455 (Ky. 2011). In *Blades* this court used the word "prison" in conjunction with the word "imprisonment" when discussing the provisions of KRS 532.080. Based on this language in *Blades,* Boyd argues that "imprisonment" refers exclusively to state run penitentiaries, as opposed to jails and, for PFO purposes, imprisonment must occur in state penitentiaries. *Id.*

■ Boyd does not cite any authority suggesting that "prison" and "jail" are different for PFO purposes, nor can we find any authority supporting that conclusion. The definitions of jail, prison, and imprisonment all contain the phrase "to confine." *Black's Law Dictionary*, 851, 1232, 773 (8th ed.2004). Some individuals serve entire sentences in county jails, some in state prisons, and some in a combination of both. To suggest that the felonies of individuals who serve time in county jail do not count simply because they were not in the state penitentiary would be an absurd result. To hold that county jails are so inherently different so as to void any chance of PFO convictions would require a reworking of the PFO statute, or the Kentucky penal system, and would be a result unsupported by the purposes of the PFO statute. *See Blades*, 339 S.W.3d at 456 ("We will not subvert the rehabilitative purpose of KRS 532.080 as outlined by the Court of Appeals in *Williams*, [*Williams v. Commonwealth*, 639 S.W.2d 788 (Ky.App.1982) ], by interpreting the statute in an absurd manner which is necessary to sustain Appellant's argument.") The Commonwealth's goal in sentencing felons to imprisonment is to keep them out of society and to provide rehabilitation. Regardless of the way in which the Commonwealth achieves that goal, whether through incarceration in county jails or state penitentiaries, the intent is the same, to prevent the individuals convicted from committing additional crimes. We do not find any difference in serving time in county jails compared to state penitentiaries for the purposes of PFO convictions.

■ Boyd next contends that his convictions fit into the "concurrent sentence break" defined in KRS 532.080(4). We find *Blades* to be informative on the issue. In *Blades*, the appellant argues that he was denied due process because the Commonwealth failed to prove he was a first-degree PFO. *Blades*, 339 S.W.3d at 450. The appellant committed one felony, served time, and was released on parole. He then committed another felony. *Id.* We held that these two felonies do not count as concurrent specifically because there was a break in time between serving the sentence for each felony. *Id. Blades* clearly states, " 'concurrent sentence break' does not apply to individuals who commit a felonious act, receive a sentence, and then subsequently commit another felonious act and receive another sentence." *Blades*, 339 S.W.3d at 456. Boyd committed a felonious act (Hart County and Barren County felonies), received a sentence (five years' imprisonment), was granted shock probation, and then subsequently committed another felonious act (Warren County felony) and received another sentence (one year imprisonment). Thus, the Barren County felony and the Hart County felony count as a single felony because Boyd served the time concurrently. However, Boyd committed the Warren County felony while he was out of jail on shock probation, thus there was a break in the time being served. Therefore, the Hart and Barren County felonies and the Warren County felony are properly considered

to be two separate felonies. Accordingly, the felony now on appeal is Boyd's third felony for PFO purposes. Having two prior felonies and now being convicted of a third, Boyd satisfies the elements of first-degree PFO, and his conviction for that offense is proper. There was no error.

## IV. CONCLUSION

For the foregoing reasons, we hereby affirm Appellant's conviction and sentencing.

All sitting. All concur.