RENDERED: SEPTEMBER 12, 2025; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-0823-MR

ERIC E. TAYLOR                                APPELLANT


             APPEAL FROM JEFFERSON CIRCUIT COURT
v.              HONORABLE JESSICA E. GREEN, JUDGE
                 ACTION NO. 23-CR-000173


COMMONWEALTH OF KENTUCKY              APPELLEE


OPINION
AFFIRMING

** ** ** ** **

BEFORE: CALDWELL, CETRULO, AND ECKERLE, JUDGES.

ECKERLE, JUDGE: Appellant, Eric E. Taylor ("Taylor"), challenges a jury verdict and judgment of the Jefferson Circuit Court convicting him of complicity to assault in the first degree. He argues that the Trial Court improperly allowed a police officer to narrate a surveillance video depicting the assault, and that he was entitled to a directed verdict on the charge. After careful consideration, we conclude that the officer's testimony was not improper, and there was substantial

evidence for the jury to find Taylor guilty of the crime of complicity to first-degree assault. Hence, we affirm.

## I. Factual and Procedural History

On the evening of August 3, 2022, three men assaulted John DeFrank ("DeFrank") in the parking lot of a Circle K convenience store, located at 219 West Florence Avenue in Louisville, Jefferson County, Kentucky. They robbed DeFrank and shot him several times, hitting his head and chest. DeFrank suffered severe injuries from the assault, including the loss of his left eye and part of his brain.

Louisville Metro Police Department ("LMPD") responded to the scene and tended to DeFrank's extensive injuries. They found Taylor's cell phone in the parking lot. They then found Taylor himself slumped on a bench at a bus stop a few blocks away with gunshot wounds to his torso and leg. The police found another cell phone at the scene but were unable to identify its owner or the other two assailants.

LMPD cameras, located across the street from the store, captured images of the incident. However, the video recording lacked audio, and it was not of sufficient quality to confirm the identity of the victim or the assailants.

On January 24, 2023, a Jefferson County grand jury indicted Taylor for assault in the first degree by complicity and robbery in the first degree by

complicity of DeFrank. The matter proceeded to a three-day jury trial, beginning March 19, 2024.

The Commonwealth called DeFrank as a witness at trial. He had required extensive hospitalizations and multiple surgeries, and he suffered permanent impairment. Due to his severe injuries, DeFrank could not remember what had happened the night of the alleged crimes. DeFrank testified at trial that his normal routine when he left home was to bring with him his wallet, pocketknife, phone, cigarettes, lighter, and two pistols – a Sig Sauer 9 mm and a Ruger LCP .380. These guns were stolen from DeFrank during the assault and never recovered.

On the second day of trial, the Commonwealth called Detective Abigail Christman ("Christman") to testify about her investigation and to provide context for the videotaped footage. Taylor's counsel objected, arguing, *inter alia*, that Christman's testimony violated Kentucky Rules of Evidence ("KRE") 602 and KRE 701 by providing narrative testimony concerning the video recording about which she lacked personal knowledge. The Trial Court overruled Taylor's objection in general, but it cautioned that it may sustain future objections to specific portions of Christman's testimony.

The Commonwealth then played the silent video footage for the jury without any comment from Christman. It showed DeFrank sitting on a curb in

front of the store with a man, who was wearing a red shirt and who was later identified as Taylor. Two other men approached from behind. Taylor then punched DeFrank, and the two other men immediately joined in the assault. They robbed DeFrank and took his guns. One of the assailants shot DeFrank several times. Taylor also sustained gunshot injuries to his torso and leg during the assault.

After the video played, the Commonwealth asked Christman about her observations on the night of the assault, both at the convenience store and at the bus stop where Taylor was found. She commented that despite Taylor's injuries, he managed to ride his bicycle from the scene. LMPD would later find him a short distance away where he had collapsed on the bench. The other two men escaped into the night, and they have still not been identified.

The Commonwealth also asked Christman about how she used the video in her investigation. Christman noted that Taylor was found wearing the same type of red shirt as the initial assailant in the video.

On re-direct, the Commonwealth played the video again. During the first 26 seconds of uninterrupted playback, the footage showed Taylor and DeFrank standing next to each other. The Commonwealth paused playback and asked Christman:

> **Commonwealth**: At this point in the video, do you observe any altercation between the person you identified

as the defendant and the person you identified as the victim?

**Christman**:  No, Ma'am.

Video Record ("VR") 3/20/24, at 11:55:00-11:55:26.

During the next 38 seconds of uninterrupted playback, the footage showed two men approach DeFrank from behind, but in full view of Taylor.  As soon as the two men came near, Taylor punched DeFrank.  While playback continued the Commonwealth asked Christman:

**Commonwealth**:  Is what we just observed what you believe to be the first strike?

**Christman**:  Yes, Ma'am.

**Commonwealth**:  How close are the other two unidentified individuals when that punch was thrown?

**Christman**:  Very close.

**Commonwealth**:  And how quickly did they, based on what you're observing in the video, join that altercation?

**Christman**: Within seconds.

*Id.* at 11:55:26-11:56:23.

As the video played, Christman identified Taylor's actions during the assault, including being shot and ending with his escape on a bicycle.  Christman further testified that Taylor's cell phone was found at the scene of the assault.  Although Christman could not identify the two other people involved with

-5-

certainty, she further testified that Taylor had sent a text message to a woman whose name was also on another cell phone that she believed belonged to one of the other assailants. Christman did not opine that Taylor had shot DeFrank but concluded that Taylor had acted in concert with the other men to commit the assault.

Taylor testified in his own defense but admitted that he was present at the scene and punched DeFrank as the other two men were approaching. Taylor testified that he started a conversation with DeFrank and requested a cigarette. Taylor testified that DeFrank appeared increasingly agitated as the conversation continued. Taylor stated that he became concerned when he saw that DeFrank was armed and then saw the other two men approach. Taylor, who had been shot before by someone else, testified that he believed that DeFrank was going to shoot him. After the other two men attacked DeFrank, Taylor heard gunshots and realized that he had also been struck. He believed that DeFrank shot him. He then fled the scene on his bicycle.

The defense had moved for a directed verdict at the close of the Commonwealth's case-in-chief, and it renewed the motion at the close of all of the proof, arguing that the Commonwealth had failed to prove all elements of the assault-in-the-first-degree charge by complicity. The defense cited the poor quality of the video evidence and Taylor's testimony that he did not know the other two

assailants and that he believed that he was going to be shot by DeFrank. The Trial Court ruled that these were questions of fact for the jury. It also ruled that a reasonable jury, viewing the evidence as a whole in the light most favorable to the Commonwealth as required, could find that Taylor acted in complicity to commit the assault and robbery.

After deliberating, the jury acquitted Taylor of complicity to first-degree robbery. However, the jury convicted Taylor of complicity to first-degree assault and recommended a sentence of 12 years in prison. Prior to final sentencing, Taylor moved for a judgment notwithstanding the verdict, or in the alternative, for a new trial. The Trial Court denied both motions. After the Trial Court issued its final judgment and sentence, this appeal followed. Additional facts will be set forth below as necessary.

## II. Claims of Error on Appeal

### a. Admission of Christman's testimony

Taylor raises two grounds of error. First, he argues that Christman improperly narrated and interpreted the video evidence. We review the Trial Court's evidentiary rulings for abuse of discretion. *Boyd v. Commonwealth*, 439 S.W.3d 126, 129 (Ky. 2014). Abuse of discretion occurs when the Trial Court's decision in allowing or disallowing the introduction of evidence was arbitrary, unreasonable, unfair, or unsupported by sound legal principles. *Commonwealth v.*

*English*, 993 S.W.2d 941, 945 (Ky. 1999) (citing 5 AM. JUR. 2D *Appellate Review* § 695 (1995)). Additionally, "[a] non-constitutional evidentiary error may be deemed harmless . . . if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error." *Winstead v. Commonwealth*, 283 S.W.3d 678, 688-89 (Ky. 2009).

KRE 602 and KRE 701 govern the admissibility of narrative testimony. *Morgan v. Commonwealth*, 421 S.W.3d 388, 391-92 (Ky. 2014). KRE 602 limits testimony to matters within the personal knowledge of the witness; while KRE 701, in pertinent part, further limits testimony by a lay witness to matters: "(a) [r]ationally based on the perception of the witness; [and] (b) [h]elpful to a clear understanding of the witness'[s] testimony or the determination of a fact in issue[.]" Under these rules, a lay witness "may not 'interpret' audio or video evidence, as such testimony invades the province of the jury, whose job is to make determinations of fact based upon the evidence." *Cuzick v. Commonwealth*, 276 S.W.3d 260, 265-66 (Ky. 2009) (internal quotation marks in original). Generally, "[i]t is for the jury to determine as best it can what is revealed in the tape recording without embellishment or interpretation by a witness." *Gordon v. Commonwealth*, 916 S.W.2d 176, 180 (Ky. 1995).

However, narration of video-taped footage is permissible under certain circumstances. *Morgan*, 421 S.W.3d at 388. For instance, narration is

allowed where it is comprised of opinions and inferences that are rationally based on the witness's own perceptions of matters of which she had personal knowledge and that are helpful to the jury. *Id.* Nonetheless, witness narration is not unlimited, but rather contained to a description of events, and Trial Courts must not allow narration to veer into improper interpretation of the footage. *Cuzick*, 276 S.W.3d at 266.

In the above-cited cases, the Kentucky Supreme Court set forth the permissible bounds of narrative testimony under these rules. In *Gordon*, *supra*, the Commonwealth called an informant to testify regarding his interpretation of a substantially inaudible recording. *Id.* at 179-80. The Supreme Court held that the informant was entitled to testify as to his recollection of what was said. However, the witness could not interpret the tape to describe the inaudible sections. *Id.* at 180. Similarly, in *Cuzick*, *supra*, the Commonwealth called two officers to narrate a dash-cam video of a high-speed vehicle chase. But both officers merely described the images on the video from their perspectives as the chase occurred. *Id.* at 265. The Supreme Court held that the narrative testimony was not improper. *Id.* at 266.

Likewise, in *Morgan*, *supra*, the Commonwealth called three witnesses to identify the defendant as the person shown on a store surveillance video and in photos. *Id.* at 391. The Supreme Court held that their testimony did

not implicate "narrative-style testimony" because they identified the defendant based upon their personal knowledge of the defendant's appearance. *Id.* at 392. And in *Boyd*, *supra*, two witnesses narrated security camera footage of a burglary. *Id.* at 131. The Supreme Court held that the witnesses' testimonials were proper to the extent that they merely narrated the events as they occurred and made an identification based upon personal knowledge of the individuals involved. *Id.* at 131-32. However, the testimony was improper to the extent that it exceeded their personal knowledge of events. *Id.* at 132. Nevertheless, the Supreme Court concluded that the error was harmless "because the jurors were watching the video and were in a position to interpret the security footage independently from the testimony, which provides fair assurance that the judgment was not substantially swayed by the error." *Id.* (internal quotation marks omitted).

Turning back to the current case, Christman did not have personal knowledge of the events depicted on the video. However, neither side asked her to interpret the video. Rather, Christman only described the relation of the video to her investigation of the case. Christman testified from her personal knowledge that Taylor was found wearing the same type of red shirt as the individual shown in the video recording. And when he was arrested, Taylor had bullet wounds that were consistent with the gunfire depicted.

We conclude that Christman's testimony did not implicate KRE 602 and KRE 701 because her identification was based upon her independent, personal knowledge of Taylor's physical appearance at the time of his arrest. In addition, an officer may explain the relationship of different items in the context of her investigation. *McRae v. Commonwealth*, 635 S.W.3d 60, 70 (Ky. 2021). Moreover, the Commonwealth and Christman possessed other evidence, such as Taylor's cell phone and his injuries, that was sufficient to place him at the scene.

We further conclude that the other cited portions of Christman's testimony did not constitute improper narrative testimony. As noted above, the jury was able to view the video at the outset in its entirety without any commentary. This is the exact type of independent videotape viewing by a jury that the Supreme Court has countenanced. *Morgan*, 421 S.W.3d at 388.

Only on re-direct, and only after Taylor's questioning, did the Commonwealth ask Christman to comment upon the events that had been shown on the videotape. Even then, Christman merely described the timing when Taylor first struck DeFrank, the proximity of the other assailants when he did so, and when the other assailants joined in the altercation. Because Christman's testimony was only responsive to the Commonwealth's questions, it did not constitute narrative testimony. *Cuzick*, 276 S.W.3d at 266. And to the extent that Christman testified about events with which she was not personally familiar, her testimony

-11-

did not progress into the realm of offering opinions or interpretation. *McRae*, 635 S.W.3d at 61. Therefore, the Trial Court did not abuse its discretion in allowing Christman's testimony.

### b. Directed Verdict

Second, Taylor challenges both of the Trial Court's denials of his motions for directed verdict. On appellate review, the test for a directed verdict, and a judgment notwithstanding the verdict, has been succinctly described as follows: "if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991); *see also Commonwealth v. Nourse*, 177 S.W.3d 691, 699 (Ky. 2005) (applying the *Benham* standard to review the grant or denial of a judgment notwithstanding the verdict). Our review is confined to the proof at trial and the statutory elements of the alleged offense. *Lawton v. Commonwealth*, 354 S.W.3d 565, 575 (Ky. 2011).

As a corollary, the Trial Court must grant a directed verdict when, taking the evidence as a whole and in the light most favorable to the Commonwealth, it would be clearly unreasonable for the jury to find him guilty. *Birdsong v. Commonwealth*, 347 S.W.3d 47, 49 (Ky. 2011). That determination turns on the specific evidence presented at trial. *Southworth v. Commonwealth*, 435 S.W.3d 32, 45 (Ky. 2014) ("Nothing suggests that the inferences the jury . . .

[made] to find guilt in this case [were] outside common experience, common sense, or reasonableness.").

The Kentucky Supreme Court has recognized that, "directed verdict issues are distinct for purposes of appeal." *Sutton v. Commonwealth*, 627 S.W.3d 836, 847 (Ky. 2021). "The directed-verdict question is not controlled by the law as described in the jury instructions, but by the statutes creating the offense." *Smith v. Commonwealth*, 636 S.W.3d 421, 434 (Ky. 2021) (citing *Ray v. Commonwealth*, 611 S.W.3d 250, 266 (Ky. 2020)). Fundamentally, "the question on a directed verdict motion is not necessarily what evidence supporting the defendant was solicited, but rather what evidence the Commonwealth produced in support of its burden of proof." *Sutton*, 627 S.W.3d at 848. Additionally, "[i]t is also axiomatic that the jury is not required to believe self-serving statements from the defendant or any of his witnesses." *Pollini v. Commonwealth*, 172 S.W.3d 418, 426 (Ky. 2005).

In this case, the specific issue is whether Taylor's initiation of the assault supports liability under the intentional or wanton theories of complicity. The jury instructions, which are not at issue, for both the intentional and wanton theories of first-degree assault contained a "complicity" element based upon Kentucky Revised Statute ("KRS") 502.020, which states:

> (1) A person is guilty of an offense committed by another person when, with the intention of promoting or facilitating the commission of the offense, he:

-13-

(a) Solicits, commands, or engages in a conspiracy with such other person to commit the offense; or

(b) Aids, counsels, or attempts to aid such person in planning or committing the offense; or

(c) Having a legal duty to prevent the commission of the offense, fails to make a proper effort to do so.

(2) When causing a particular result is an element of an offense, a person who acts with the kind of culpability with respect to the result that is sufficient for the commission of the offense is guilty of that offense when he:

(a) Solicits or engages in a conspiracy with another person to engage in the conduct causing such result; or

(b) Aids, counsels, or attempts to aid another person in planning, or engaging in the conduct causing such result; or

(c) Having a legal duty to prevent the conduct causing the result, fails to make a proper effort to do so.

Because both theories included a complicity element, the jury was instructed that a person is guilty of an offense committed by another if, with intent to promote or facilitate the offense, he aided, conspired with, or otherwise assisted the other person in committing the act (complicity as to the act), or if he acted wantonly with respect to the result and aided or conspired with the other person in

-14-

engaging in the conduct (complicity as to the result). In relevant part, KRS

501.020(3) defines wanton conduct as follows:

> A person acts wantonly with respect to a result or to a
> circumstance described by a statute defining an offense
> when he is aware of and consciously disregards a
> substantial and unjustifiable risk that the result will occur
> or that the circumstance exists. The risk must be of such
> nature and degree that disregard thereof constitutes a
> gross deviation from the standard of conduct that a
> reasonable person would observe in the situation.

Our Supreme Court has interpreted the language of KRS 502.020(1)

to be "broad enough to embrace acts . . . and every form of participation in

concerted criminal activity." *Young v. Commonwealth*, 426 S.W.3d 577, 582 (Ky.

2014) (quoting GEORGE G. SEELIG, KENTUCKY CRIMINAL LAW § 3-3(b)(4) at 107

(2d. ed. 2008)). The Kentucky Supreme Court has also recognized the long-

established rule that "[t]he degree of an accomplice's liability was determined by

his or her own *mens rea* and not that of the principal." *Tharp v. Commonwealth*,

40 S.W.3d 356, 365 (Ky. 2000) (citing *Fuson v. Commonwealth*, 199 Ky. 804, 251

S.W. 995, 997 (1923)).

In *Harper v. Commonwealth*, 43 S.W.3d 261 (Ky. 2001), that high

Court explained further that:

> [U]nder subsection (2) of KRS 502.020, an accomplice's
> liability and the principal actor's liability can be at
> different levels. [Also,] under subsection (2), proof of
> the principal actor's mental state is not even necessary.
> As to the principal actor, proof that another caused the

prohibited result is all that is required. Under subsection (2), only the defendant/accomplice's mental state is at issue, *i.e.*, the Commonwealth must prove the accomplice's culpability toward the prohibited result.

*Id.* at 267.

Thus, the key difference between complicity as to the act (KRS 502.020(1)) and as to the result (KRS 502.020(2)) is the required mental state. To be complicit in the act, a person must have intended to help commit the crime (specific intent to promote or facilitate the offense). *Marshall v. Commonwealth*, 60 S.W.3d 513, 518 (Ky. 2001). But to be complicit in the result, the law does not require intent. Rather, a defendant is criminally liable when he acts with the same degree of culpability with respect to the *result* that would be sufficient for the commission of the offense. *Id.* (citing *Tharp*, 40 S.W.3d at 361) (emphasis in original). Additionally, "the factfinder has wide latitude in inferring intent from evidence of the defendant's conduct and knowledge, and/or the surrounding circumstances." *Id.*

However, "although intent that a victim be [harmed] may be inferred from conduct or knowledge, such intent may not be predicated on the mere intent to participate in the underlying felony." *Id.* (citing *Kruse v. Commonwealth*, 704 S.W.2d 192, 194 (Ky. 1985)). And a defendant's liability for the acts of a co-conspirator must be determined by the defendant's own mental state, not that of the co-conspirator. *Kruse*, 704 S.W.2d at 194.

-16-

In *Stieritz v. Commonwealth*, 671 S.W.3d 353 (Ky. 2023), the Kentucky Supreme Court further expounded that a defendant's culpability for complicity can be based upon the entirety of the circumstances as a whole, including his conduct before and/or after the crime, and even upon the victim's injury alone:

> A jury may infer a defendant's intent to commit a criminal offense from the surrounding circumstances. *Commonwealth v. Wolford*, 4 S.W.3d 534, 539 (Ky. 1999). Indeed, intent may be properly "inferred from the character and extent of the victim's injuries." *Ratliff v. Commonwealth*, 194 S.W.3d 258, 275 (Ky. 2006) (quoting *Parker v. Commonwealth*, 952 S.W.2d 209, 212 (Ky. 1997)). Moreover, "[i]ntent may be inferred from actions because a person is presumed to intend the logical and probable consequences of his conduct and a person's state of mind may be inferred from actions preceding and following the charged offense." *Id.*

*Id.* at 361. In *Stieritz*, the victims, McVey and Johnson, stopped at a gas station, where Johnson and another man, Lane, became embroiled in an argument. *Id.* at 357. As McVey drove away from the store with Johnson in the front passenger seat, they noticed that they were being followed by another vehicle. *Id.* at 357-58. Stieritz admitted that he was driving the vehicle with Lane as his occupant and following McVey and Johnson. *Id.* at 358. Lane shot at the victim's car, striking the other vehicle several times, and hitting McVey. *Id.* Stieritz was charged and convicted of complicity to attempted murder and complicity to second-degree assault. *Id.* at 358-59.

-17-

After analyzing the directed-verdict standard and the elements of complicity, the Kentucky Supreme Court concluded that Stieritz was not entitled to a directed verdict on complicity, either to attempted murder or second-degree assault. With regard to the attempted murder, the Supreme Court pointed to the evidence that Stieritz knowingly drove the vehicle in pursuit of the victims, thereby facilitating Lane's ability to shoot. *Id.* at 362. Indeed, Stieritz gave Lane the loaded handgun. *Id.* Furthermore, Stieritz admitted that he knew Lane intended to shoot at the other vehicle. *Id.* "From these facts, the jury could reasonably determine [that Lane] possessed the requisite intent to commit attempted murder as the principal[,] and Stieritz likewise possessed the requisite intent to be convicted as [Lane's] accomplice." *Id.* Based on these same facts, the Supreme Court concluded that there was sufficient evidence of Stieritz's intent to be transferred to the second-degree assault of McVey as an unintended victim. *Id.* at 363.

With these delineations in mind, we turn to whether the facts presented at trial in this case sufficiently supported both theories of complicity in totality such that it would not be "clearly unreasonable for a jury to find guilt." *Benham*, 816 S.W.2d at 187. We find that the surrounding circumstances – captured on surveillance video and supported by Taylor's own testimony – reasonably support the jury's conclusion that Taylor was complicit in either the act

-18-

of first-degree assault or the resulting injuries, or both. Thus, no directed verdict of acquittal was warranted.

In the current case, as in *Stieritz*, there was no evidence that Taylor fired the weapon used to commit the underlying felony of first-degree assault. However, it is undisputed that Taylor threw the first punch – an act that felled DeFrank and objectively facilitated the ensuing assault. Surveillance video further showed that just before Taylor landed the blow, two unidentified men approached and flanked the victim. According to Christman, these men joined the assault "within seconds," culminating in one of them shooting DeFrank at point-blank range. Christman's observations were supported by both the video and by Taylor's own testimony.

Unlike in *Stieritz*, Taylor claimed that he did not know the other attackers. He also declined to identify himself at the scene. But Taylor unquestionably knew the victim was armed and that others were approaching when he hit DeFrank first. Consequently, Taylor either anticipated or ignored the substantial risk of escalating brutality – violence he initiated. By physically assaulting an armed person amid other potential aggressors, Taylor could reasonably foresee that his actions could lead to injury, gun-related or otherwise. DeFrank's severe injuries – being beaten and then shot – show that serious harm or death was a probable outcome of Taylor's conduct. Accordingly, the jury could

reasonably infer both Taylor's intent to promote the assault and his culpability for the life-threatening harm that resulted, consistent with *Marshall* and *Stieritz*.

Additionally, our Supreme Court has recognized that a defendant may be found complicit based on lawful acts done in furtherance of a criminal scheme. *Webb v. Commonwealth*, 904 S.W.2d 226, 229 (Ky. 1995). In *Webb*, the defendant's act of providing transportation – a lawful activity – was sufficient to establish complicity in a drug trafficking offense. *Id.* Similarly, Taylor's acts of initiating conversation and requesting a cigarette, while lawful in isolation, could be construed as part of a coordinated assault and properly considered as evidence of complicity. Given that one of DeFrank's two firearms was visibly holstered, Taylor would have immediately noticed it. His otherwise lawful acts could reasonably be interpreted by the jury as efforts either to put the victim at ease or to divert his attention, thereby facilitating the coordinated approach of the two other men to attack and rob him. Such conduct supports the theory that Taylor's intentional objective was to aid in the commission of the crime, and the jury's consistent verdict was not unreasonable under these circumstances.

Taylor argues that, because the jury acquitted him of first-degree robbery, it would be contradictory to find that he was complicit with the other men in the assault on the victim. (Appellant's Brief, p. 20.) Taylor's interpretation reflects an incomplete reading of the complicity statute by asserting that it requires

-20-

a "common plan or scheme with the uncharged individuals." (Appellant's Brief, p. 14.) This interpretation reflects only the first prong of the complicity statute, which speaks solely to intent. In contrast, the second prong of KRS 502.020 permits a finding of complicity in the result – where the defendant acted with a lower mental state, such as wantonness or recklessness – neither of which requires proof of intent.

We again note Taylor's admission that he saw DeFrank was armed but maintained proximity to a weapon instead of walking away. VR 3/20/24, at 2:12:15. Taylor is a convicted felon, and thus he knows that he is not permitted to remain in proximity to a handgun or firearm. Aware that DeFrank was armed, he made the decision to approach DeFrank intentionally, asked for a cigarette, and started talking. He remained there, alone with DeFrank, even though he says he believed that DeFrank was becoming agitated. Taylor claims that it was later reasonable to start a fight even though he knew DeFrank was armed.

Taylor further contends that his injuries could only have come from DeFrank shooting him intentionally. Because he asserts that the other men did not shoot him, Taylor believes that he cannot be found liable for being complicit with them when they shot DeFrank. He does not consider that DeFrank may have fired a few shots during the "seconds" it took the other two men to join the assault. Those men ultimately overcame DeFrank, took his weapons, and used them against

-21-

him. Taylor's own account is consistent with the inference that DeFrank shot Taylor after Taylor's initial assault but before the other assailants took his guns.

Taylor's other admissions also align with the jury's verdict. Taylor repeatedly claimed that he did not know the two men who attacked the visibly armed victim. But the surveillance footage showed Taylor watching them as they approached and flanked the victim before Taylor threw the first punch. Taylor was unarmed and outnumbered by two unknown men that may have been armed, as well as DeFrank, who Taylor knew was carrying at least one firearm. Even so, he waited until the other men were within striking distance before starting the assault on DeFrank. More important, under cross-examination, Taylor admitted to continuing the attack alongside the others. VR 3/20/24, at 2:28:32. In addition, Taylor's cell phone had a contact in common with one of the unknown assailant's phone, and Taylor had sent a text message to that person. A core function of a jury that determines the facts is the judging of a witness's credibility, and Taylor gave this jury plenty to doubt about his veracity.

In addition to Taylor's own statements and conduct, the sequence of events permits the reasonable inference that Taylor anticipated the involvement of the two other men in the assault – undermining his claim that he had no connection to them and providing a basis for the jury's finding of complicity. As stated, the jury has the job of determining what is to be believed, and the jurors here simply

and clearly did not believe Taylor's story. But even if the jury had doubted Taylor's particular claim that he did not know the other assailants, it could still have reasonably found that the timing of his punch, thrown just as the men flanked the victim, undermines the credence of Taylor's claim that he acted alone. A jury could reasonably find it implausible that Taylor would initiate a violent assault while in the presence of two unknown, potentially armed individuals unless he had reason to believe they were aligned with him and would not intervene on the victim's behalf. The coordination of these actions can support a reasonable inference that Taylor acted either in concert with the men or, at minimum, with the awareness that his conduct would facilitate their assault. Thus, the Trial Court properly found sufficient evidence to send the case to the jury and let these 12 jurors ultimately decide unanimously that Taylor was guilty of complicity to assault in the first degree, but not guilty of complicity to robbery in the first degree. In light of all of the evidence, the Trial Court did not abuse its discretion by denying Taylor's motions for directed verdict or judgment notwithstanding the verdict.

## III. Conclusion

Accordingly, we affirm the judgment of conviction of the Jefferson Circuit Court.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Jennifer E. Hubbard
Assistant Public Advocate
Department of Public Advocacy
Louisville, Kentucky

BRIEF FOR APPELLEE:

Russell Coleman
Attorney General of Kentucky

Melissa A. Pile
Assistant Attorney General
Frankfort, Kentucky