RENDERED: AUGUST 14, 2025
TO BE PUBLISHED

# Supreme Court of Kentucky

2023-SC-0357-MR

RONALD SIMPSON                                                  APPELLANT

V.                 ON APPEAL FROM KENTON CIRCUIT COURT
HONORABLE KATHLEEN LAPE, JUDGE
NO. 22-CR-00337

COMMONWEALTH OF KENTUCKY                          APPELLEE

**OPINION OF THE COURT BY JUSTICE GOODWINE**

**<u>REVERSING AND REMANDING</u>**

A Kenton County jury convicted Ronald Simpson ("Simpson") of murder and the trial court sentenced him to thirty years' imprisonment. He appeals to this Court as a matter of right. KY. CONST. § 110(2)(b). After careful review, we reverse and remand for a new trial.

**<u>BACKGROUND</u>**

In 2022, a Kenton County grand jury indicted Simpson for the murder of Randel Helton ("Helton"). The trial court scheduled the trial to begin on May 30, 2023. In the month prior to trial, the Commonwealth amended the indictment against Simpson twice to charge him as a persistent felony offender ("PFO") in the first degree and to include complicity in the murder charge. On May 17, 2023, Simpson requested funds to retain a forensic medical expert.

Two days later, he moved for a continuance to allow him time to hire an expert and prepare for trial based on the amended indictment. The trial court granted his request for funds but denied his motion for a continuance. The trial proceeded as scheduled.

At trial, the Commonwealth called H.P.[1], a former officer with the Covington Police Department ("CPD"); Derek Uhl ("Uhl"), a Sergeant with the CPD; Torie Vilvanathan ("Vilvanathan"), a crime scene technician with the CPD; Alice McCall ("McCall"), Bradley Ard ("Ard"), and Casey Penick ("Penick"), all of whom lived in the apartment complex where the murder occurred; Gavin Hall ("Hall") and Katherine Spendel ("Spendel"), Kentucky State Police forensic scientists; Dr. Sarah Maines ("Maines"), the Commonwealth's forensic pathologist; and Jim Lindeman ("Lindeman"), the CPD detective assigned to the case. Simpson testified in his own defense.

Evidence at trial focused on the events of the night of December 31, 2021, and the morning of January 1, 2022. On the afternoon of December 31st, Simpson visited his estranged wife, Hope, at her apartment in a complex on Hermes Avenue in Covington, Kentucky.[2] Later in the afternoon, Simpson went to a nearby bar with Jennifer Michaud ("Michaud"),[3] one of Hope's

---

[1] The officer's full name is not discernable from the video record. He requested to be called "H.P." during his testimony.

[2] The apartment complex was owned and operated by Transitions, an organization that provided transitional housing to individuals in recovery for substance use issues.

[3] Although she was subpoenaed by the Commonwealth, Michaud did not testify at trial. According to Detective Lindeman's testimony, she was not charged with any crime as a result of these events.

neighbors, to watch a University of Cincinnati ballgame. Michaud lived with Helton, her boyfriend, with whom she had a volatile relationship. Helton watched Simpson and Michaud leave the complex from the apartment balcony, spitting and yelling at them. Later in the evening, Michaud and Simpson returned to the apartment together. Helton was present when they arrived and, from that point on, only Helton, Simpson, and Michaud were present in the apartment during the night except for a brief visit by Penick and Ard.

The Commonwealth presented footage from McCall's security camera of the night of December 31st and the morning of January 1st.[4] The video showed Simpson repeatedly tossed, pushed, and dragged Helton out of the apartment onto the balcony during the night.

Penick and her boyfriend, Ard, testified they heard yelling and crashing from Michaud's apartment which prompted them to check on her twice during the night. On the first visit, they entered Michaud's apartment and saw that it was in disarray. Simpson, Michaud, and Helton were in the apartment. Penick described Helton as bloodied and appearing to have been beaten up, with contusions on his head and a black eye. Helton appeared extremely intoxicated and was barely able to stand up from where he was sitting on the couch. While Penick was in the apartment, Simpson told Helton he was not

---

[4] The Commonwealth entered unedited copies of the security footage through McCall's testimony. Later, Detective Lindeman testified to clips of the footage which were zoomed in on Michaud's balcony. Some of the clips were slowed to half their original speed.

going to continue to hit Michaud or call Simpson racial slurs.[5] Penick offered to call 911 but Simpson and Michaud told her not to do so.

The second time Penick and Ard checked on Michaud, Simpson and Michaud were standing on the balcony laughing and joking. Helton was lying on the floor. Michaud and Simpson laughed when Penick asked if Helton was okay. Michaud said, "Yeah, he's just dead." Video Record ("V.R.") 5/31/23 at 3:05:10-12. Simpson hushed Michaud. Penick again offered to call 911, but Simpson and Michaud told her not to call.[6] Penick and Ard returned to their apartment.

The next morning, Michaud ran to Penick's apartment yelling that Helton was dead. Penick and Ard went to her apartment. They saw Helton's body was lying on a couch in the bedroom. Penick called 911.

The police investigation determined blood on Simpson's shirt, swabs from the bedroom floor, a cigar, and a cup found in the living room tested presumptively positive for blood matching Helton's DNA profile. During Vilvanathan's testimony, the Commonwealth entered twenty-six photos of Helton's body at the crime scene, both on the couch and on top of the body bag after he was moved to the floor.

Dr. Maines testified to Helton's injuries. During her testimony, the Commonwealth presented seventy-six photos of Helton's body from the

---

[5] Helton was white, and Simpson is African American.

[6] In his testimony, Simpson claimed he asked Penick to call 911, but she refused. He testified that he could not call 911 himself because he did not have a cellphone.

autopsy. He had numerous scrapes and contusions on his body. He had five broken ribs, a fractured C4 vertebrae in his neck, and a broken hyoid bone. The autopsy revealed internal hemorrhaging in his head, torso, and throat. Dr. Maines testified that Helton's death was a homicide caused by strangulation and blunt force injuries to his head, neck, and torso sustained by an "assault by another person(s)." Commonwealth's Exhibit 201. She was unable to identify a single injury which caused his death but testified that the totality of his injuries caused "neurologic death." She explained that when Helton's body was unable to get enough oxygen, his organs gradually shut down until he died. She was also unable to identify when the injuries occurred but testified they likely occurred within the twenty-four hours prior to his death.

At the close of the Commonwealth's case-in-chief, the trial court denied Simpson's motion for directed verdict. The jury ultimately found Simpson guilty of murder and being a PFO in the first degree and recommended a sentence of thirty years' imprisonment. The court imposed the jury's recommended sentence. This appeal followed.

## ANALYSIS

On appeal, Simpson raises the following arguments: (1) the trial court erred by denying his motion for a continuance; (2) the trial court allowed the Commonwealth to improperly question Simpson by (a) asking him to comment on the credibility of other witnesses, and (b) asking him a hypothetical question requiring a legal conclusion; (3) the court erred by denying his motion for directed verdict; (4) the court should not have admitted cumulative, prejudicial

5

photographs of Helton's body from the crime scene and autopsy; and (5) cumulative errors rendered his trial fundamentally unfair.

## 1. The trial court abused its discretion by denying Simpson's motion to continue the trial but granting his motion for funding to hire an expert witness.

First, Simpson argues the trial court should have granted him a continuance to hire an expert witness. "The court, upon motion and sufficient cause shown by either party, may grant a postponement of the hearing or trial." RCr[7] 9.04. We review a circuit court's decision on a motion for a continuance for abuse of discretion. *Slone v. Commonwealth*, 382 S.W.3d 851, 855-56 (Ky. 2012) (citations omitted). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Id.* at 856 (quoting *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999)).

Simpson was indicted for Helton's murder on April 7, 2022. On December 7, 2022, the trial court scheduled the trial to begin on May 30, 2023. The trial order states, "[p]ursuant to RCr 8.20(1), all pretrial motions shall be filed and noticed for a hearing no later than fifteen (15) days prior to the scheduled trial date." Record ("R.") at 33. On May 11, 2023, the Commonwealth amended the indictment against Simpson to charge him with PFO in the first degree. On May 17th, Simpson moved, *ex parte,* for funds to retain a forensic

---

[7] Kentucky Rules of Criminal Procedure.

medical expert. On May 18th, the Commonwealth moved to amend the murder charge to include complicity.

On May 19th, Simpson asked to continue the trial for approximately three months due to the Commonwealth's amendment of the indictment and because the trial court had not yet ruled on his motion for expert funding. When it heard the motion, the trial court noted that Simpson's motion was filed outside the fifteen-day deadline set in the trial order. On May 23rd, the trial court entered an order granting Simpson's request for funding to hire an expert witness. On the same day, the trial court denied Simpson's requested continuance. The trial began as scheduled a week later.

> When ruling on a motion for a continuance the trial court must consider the facts of each case, especially the length of delay; previous continuances; inconvenience to the litigants, witnesses, counsel and the court; whether the delay is purposeful or is caused by the accused; the complexity of the case; and whether denying the continuance will lead to identifiable prejudice.

*Slone*, 382 S.W.3d at 855 (citing *Edmonds*, 189 S.W.3d 558, 564 (Ky. 2006)).[8] The first five of the six listed factors largely weigh in favor of granting the continuance. First, a delay of three months would not have been unreasonable in a murder case which was otherwise progressing quickly. Second, there had been no prior continuances or other delays. Third, the record does not demonstrate that the litigants, witnesses, counsel, or the court would have

---

[8] This list of factors is derived from *Snodgrass v. Commonwealth*, 814 S.W.2d 579, 581 (Ky. 1991). The *Snodgrass* factors also include the "availability of other competent counsel." *Id.* The availability of counsel was not at issue in Simpson's motion for a continuance.

suffered "some significant or substantial inconvenience" had the court granted a continuance. *See Eldred v. Commonwealth*, 906 S.W.2d 694, 700 (Ky. 1994), *abrogated on other grounds by Commonwealth v. Barroso*, 122 S.W.3d 554 (Ky. 2003). Fourth, Simpson did not purposefully cause any delay. Fifth, complicity to murder is "serious and of at least moderate complexity." *Manning v. Commonwealth*, 701 S.W.3d 478, 494 (Ky. 2024). This case was also made more complex by the fact that Dr. Maines was unable to precisely identify when or how Helton was injured and concluded that no single injury caused his death.

However, to determine whether the trial court abused its discretion by denying his request, we must decide whether the denial resulted in identifiable prejudice against him. Proof of "identifiable prejudice is especially important" in deciding a motion to continue. *Taylor v. Commonwealth*, 611 S.W.3d 730, 735 (Ky. 2020) (internal quotation marks and citation omitted). "A defendant must state with particularity how his or her case will suffer if the motion to postpone is denied." *Id.* at 735-36 (internal quotation marks and citation omitted). Simpson argues that, despite granting his funding request, the trial court's refusal to continue the trial was effectively a denial of an expert witness. He claims a defense expert could have made a "significant challenge" to Dr. Maines' testimony. Appellant's Brief at 12. Specifically, Simpson claims a forensic medical expert may have explained

> how the [victim's] injuries relate and the interplay
> between them[,] . . . may have come to a different
> conclusion and given a time of death and reason for

8

> that finding[,] . . . [and] may have concluded differently about the internal pooling of blood and timing of the various injuries or given evidence about how someone would act while suffering from these various injuries that differed from that of the Commonwealth's witness.

Appellant's Reply Brief at 2.

The trial court's denial of Simpson's request was primarily based on the fact that the motion was filed after the trial order deadline to file motions. "The court may, at the arraignment or as soon afterward as practicable, set deadlines for the parties to make or assert pretrial motions, defenses, objections and requests[.]" RCr 8.20(1). Trial courts have the inherent authority to enforce their own orders. *Crandell v. Cabinet for Health and Family Servs. ex rel. Dilke*, 642 S.W.3d 686, 689 (Ky. 2022) (citation omitted); *Akers v. Stephenson*, 469 S.W.2d 704, 706 (Ky. 1970) (citations omitted). This authority includes enforcement of the deadlines in trial orders. Simpson was in possession of the autopsy report for more than a year prior to trial. He had ample time to file a motion for expert funding but waited until after the trial court's fifteen-day deadline.

This Court has previously held a trial court did not abuse its discretion by denying a continuance for a defendant to hire an expert where he had been under indictment for four months and could have made his request anytime thereafter but chose to file his motion just four days before trial. *Pendleton v. Commonwealth*, 83 S.W.3d 522, 526 (Ky. 2002). Therein, the defendant wished to oppose evidence of an interview with a child victim by having an expert testify to "the coercive of suggestive propensities of the interviewing techniques"

9

used in the interview. *Id.* This Court held "the trial court did not abuse its discretion in determining that further delay for the purpose of exploring a controversial topic and setting up a battle of experts was not appropriate." *Id.*

Although there are similarities between the trial court's denial of Simpson's motion to continue and the circumstances in *Pendleton*, there is one important distinction –here, the trial court simultaneously denied the continuance but granted Simpson's motion for expert funding under KRS[9] 31.185. By statute, a defendant may request funding for use of private facilities and/or personnel for evaluation of evidence where use of state facilities and/or personnel is impractical. KRS 31.185; *see also Perry Cty. Fiscal Court v. Commonwealth*, 674 S.W.2d 954, 956 (Ky. 1984). When a trial court determines the services of an independent expert are "reasonably necessary," it must allocate funds to hire such an expert. *McKinney v. Commonwealth*, 60 S.W.3d 499, 505 (Ky. 2001) (citation omitted).

Here, in its order granting expert funding, the trial court found Simpson was "in need of an expert" and that services of an expert witness were "necessary for the preparation and presentation of a defense." The court further found that the use of state facilities and personnel was impractical. These findings are in conflict with the court's denial of Simpson's motion to continue. A trial court cannot find that an expert witness is necessary for the preparation of a defendant's defense while simultaneously preventing him from hiring such

---

[9] Kentucky Revised Statutes.

10

an expert by denying a motion for a continuance. This amounts to identifiable prejudice amounting to an abuse of discretion, which necessitates reversal.

## 2. The Commonwealth improperly questioned Simpson on cross-examination.

Simpson next raises the following issues regarding the Commonwealth's questioning of him on cross-examination: (1) he was impermissibly asked to comment on the truthfulness of other witnesses; and (2) he was erroneously asked to make a legal conclusion in response to a hypothetical posed by the prosecutor. We review a trial court's decision on whether to admit evidence, including testimony, for abuse of discretion. *Boyd v. Commonwealth*, 439 S.W.3d 126, 129 (Ky. 2014) (citation omitted).

The Commonwealth repeatedly asked Simpson to comment on the credibility of other witnesses. First, when Simpson testified that he asked Penick and Ard to call 911 but they refused, the Commonwealth asked, "So your testimony is that [Penick], someone who's not involved in this at all, walked through those courtroom doors and lied about that detail?" V.R. 6/1/23 at 4:01:00-07. Next, when Simpson disputed which portion of McCall's security footage he was shown during his police interview, the Commonwealth asked, "So now you're testifying that Detective Lindeman was not telling the truth when he told the members of this jury. . ." *Id.* at 4:21:35-41. The question was cut short by defense counsel's objection. Finally, when Simpson said he did not laugh at Helton when he was lying on the balcony, the Commonwealth asked, "So everyone's lying on you? Detective Lindeman is

11

lying on you? Casey Penick and Bradley Ard?" *Id.* at 4:35:20-24. Simpson answered "no" as his counsel objected. *Id.* at 4:35:24.

We must first address whether Simpson preserved these alleged errors for our review. The Commonwealth argues Simpson did not preserve his argument because "he did not request a ruling on the issue when the trial judge failed to make one." Appellee's Brief at 19.

In each instance, Simpson's counsel objected to the Commonwealth asking Simpson to comment on the credibility of other witnesses. In making two of the three objections, counsel cited to relevant case law, *Moss v. Commonwealth*, 949 S.W.2d 579 (Ky. 1997). On the first objection, after defense counsel argued the prosecutor could not ask Simpson to testify to the credibility of another witness, the trial court allowed testimony to proceed with only an admonishment for Simpson to answer the question being asked. In the second instance, defense counsel objected before the prosecutor finished asking the question about Detective Lindeman's credibility and the prosecutor offered to rephrase the question. Soon after, he again asked Simpson to comment on the credibility of Penick, Ard, and Detective Lindeman, and defense counsel again objected. The trial judge ultimately rejected defense counsel's argument by reasoning that Simpson opened the door to these questions.

In allowing testimony to proceed and ultimately ruling that Simpson opened the door, the trial court effectively denied defense counsel's objections. While defense counsel did not specifically ask for a ruling on their argument

12

under *Moss*, the trial court's actions can be seen only as a rejection of the argument. This is sufficient for preservation purposes.

We turn now to the substance of Simpson's claims.

> A witness should not be required to characterize the testimony of another witness, particularly a well-respected police officer, as lying. Such a characterization places the witness in such an unflattering light as to potentially undermine his entire testimony. Counsel should be sufficiently articulate to show the jury where the testimony of the witnesses differ without resort to blunt force.

*Moss*, 949 S.W.2d at 583. Decisions on the credibility of witness testimony are within the "exclusive province of the jury." *Id.* (citation omitted).

In *Barrett v. Commonwealth*, 677 S.W.3d 326, 339-40 (Ky. 2023), a sexual abuse case, the defendant was repeatedly asked about the truthfulness of the victim's testimony. On cross-examination, the defendant testified he never read a note on the victim's iPad or had a conversation with his wife and the victim. *Id.* at 339. The Commonwealth then asked, "Why would she tell the jury that if that never happened?" *Id.* at 340. The defendant said he did not understand why, and the Commonwealth asked, "You don't understand why because she has no reason to say it, does she?" *Id.*

On appeal, Barrett argued the Commonwealth's questions were a violation of *Moss. Id.* This Court compared Barrett's testimony to that of the defendant in *Graham v. Commonwealth*, 571 S.W.3d 575, 585 (Ky. 2019). *Id.* In *Graham*, the defendant testified that his last interaction with the victims, Joseph and Lonnie, was when he refused to take them fishing. 571 S.W.3d at 584-85. He said the victims "stomped into the house, went in Lonnie's bedroom

13

and locked the door." *Id.* at 585. The Commonwealth asked if the defendant believed "Joseph and Lonnie getting together in Lonnie's room that day while angry" was the reason he was on trial. *Id.* This Court held the Commonwealth's questioning of Graham was not a violation of *Moss* because the Commonwealth was attempting to clarify Graham's testimony regarding his belief that the victims made up allegations against him because they were angry with him. *Id.* Graham was not asked to call the Commonwealth's witnesses liars, nor was he placed in an unflattering light by the questioning. *Id.*

Comparatively, the Court in *Barrett* found the Commonwealth's questioning was designed to make him comment on the victim's credibility by repeatedly asking why she would testify to something that did not happen. 677 S.W.3d at 341. The Court rejected the Commonwealth's argument that its line of questions did not cross the line into impropriety under *Moss* because the prosecutor never directly asked Barrett whether the victim was lying. *Id.* Despite not explicitly asking Barrett to call the victim a liar, the Commonwealth's questions "placed him in an unflattering light and attempted to take the determination of [the victim's] truthfulness away from the jury." *Id.*[10]

This matter is easily distinguishable from *Graham* and the Commonwealth's questions were even more clearly improper than the

---

[10] Barrett did not preserve this error and requested review for palpable error. The Court held, as was found in prior decisions, that a *Moss* violation did not rise to palpable error. *Id.*

prosecutor's questions in *Barrett*. Here, the prosecutor repeatedly asked Simpson whether other witnesses, including a police detective, were lying. This is a clear violation of the standard set out in *Moss*. There is a distinct likelihood that the questions cast Simpson in a bad light and the entirety of his testimony was undermined in the eyes of the jury. The Commonwealth's decision to employ blunt force in this manner erroneously removed the judgment of credibility from the jury.

The Commonwealth's repeated cross-examination of Simpson on the truthfulness of other witnesses cannot be categorized as harmless error. "A non-constitutional evidentiary error may be deemed harmless . . . if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error." *Winstead v. Commonwealth*, 283 S.W.3d 678, 688-89 (Ky. 2009) (citing *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)). "The inquiry is not simply whether there was enough [evidence] to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." *Id.* at 689 (citation and quotation marks omitted). Here, the error is not harmless because we are not sufficiently assured that the jury was not swayed by the Commonwealth's repeated questioning of Simpson regarding the truthfulness of other witnesses.

Second, Simpson claims he was asked to respond to a hypothetical question which required him to make a legal conclusion. Over Simpson's objection, the trial court allowed the Commonwealth to pose a hypothetical in

15

its cross-examination of Simpson. The Commonwealth asked, "Mr. Simpson, you would agree if you see someone who's been shot in the stomach by a gun shot, hypothetically, and they're dying slowly, and you walk up and shoot them in the face, kill them right away, you've committed murder, right? You would agree with that hypothetically?" V.R. 6/1/23 at 4:27:09-28. After the trial court overruled Simpson's objection, the Commonwealth returned to the hypothetical and asked, "You would agree that that second person is still culpable, right?" *Id.* at 4:27:52-54. Simpson responded, "To be honest with you, no." *Id.* at 4:27:56-58.

Simpson argues he was impermissibly asked to make a legal conclusion and the question was asked solely to inflame the jury. The Commonwealth argues

> [t]here was no error because Simpson was not asked to render an opinion about what legally constituted murder. He was asked instead about culpability. Simpson offered an opinion on whether someone who hastened the death of someone who was already dying was culpable in that death. He did not draw a conclusion about whether that person was legally guilty of murder.

Appellee's Brief at 23. The Commonwealth's argument fails on two grounds.

First, the assertion that Simpson was not asked to render an opinion about what legally constitutes murder is plainly contradicted by the record. The Commonwealth asked if he would have "committed murder" had he been the second shooter in the hypothetical. This can only be viewed as asking what legally constitutes murder.

16

Furthermore, the Commonwealth's attempt to distinguish what legally constitutes murder from culpability for murder, claiming the former is a legal conclusion but the latter is not, amounts to a false distinction. As the Commonwealth knows, culpability is "[t]he mental state that must be proved for a defendant to be held liable for a crime." *Culpability*, BLACK'S LAW DICTIONARY (12th ed. 2024); *see also* KRS 501.020. It is disingenuous to claim that asking a defendant to opine on his own culpability in a hypothetical murder is anything other than eliciting a legal conclusion.

A lay witness may testify to his opinions or inferences which are:

(a) Rationally based on the perception of the witness;

(b) Helpful to a clear understanding of the witness' testimony or the determination of a fact in issue; and

(c) Not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

KRE[11] 701. Generally, it is improper for a witness to testify to legal conclusions. *Tamme v. Commonwealth*, 973 S.W.2d 13, 32 (Ky. 1998) (citation omitted). In unpublished, nonbinding decisions, this Court has found questioning a lay witness about whether a defendant acted in self-defense amounted to asking for a legal conclusion. *See Whaley v. Commonwealth*, 2009-SC-000516-MR, 2011 WL 1642191, *5 (Ky. Apr. 21, 2011); *see also Hatcher v. Commonwealth*, 2015-SC-000258-MR, 2016 WL 3370999, *8 (Ky. June 16, 2016). The Commonwealth's question undoubtedly called for Simpson

---

[11] Kentucky Rules of Evidence.

to draw a legal conclusion rather than testify to his own rationally based perceptions.

Hypothetical questions are commonly allowed during expert testimony. In such testimony, "[i]t is a fundamental rule of evidence that a hypothetical question must be based upon, or contain, a state of facts supported by some evidence." *Hodge v. Commonwealth*, 159 S.W.2d 422, 423 (Ky. 1942) (citation omitted). More recently, this Court has determined the following requirements for use of hypothetical questions:

> (1) the assumptions used in a hypothetical question were required to reflect the true state of facts in evidence; (2) competent evidence was required to be introduced to support each and every assumption used in such a question; and (3) although the supporting evidence did not have to be uncontradicted, it had to be sufficient to support findings by the jury on every assumption essential to the validity of the opinion.

*Thomas v. Commonwealth*, 170 S.W.3d 343, 352 (Ky. 2005) (citation omitted).

In *Thomas*, the defendant was convicted of first and second-degree assault for shooting two individuals during an altercation outside a bar. *Id.* at 346. At trial, an expert testified to the defendant's blood alcohol level. *Id.* at 351. During her testimony, the Commonwealth asked the expert to use retrograde extrapolation to estimate his blood alcohol level at the time of the altercation "assuming a history of alcohol abuse." *Id.* at 351-52. There was no evidence in the record showing the defendant had a history of alcohol abuse. *Id.* at 352. This Court held the "unsubstantiated hypothetical fact" could not be used to support the expert's testimony and "it served no purpose other than to

18

insinuate that [Thomas] was a person of bad character in contravention of KRE 404(a)(1)." *Id.*

Here, the Commonwealth's hypothetical question was neither based on the true state of facts in evidence nor had competent evidence been introduced to support any part of the question. Instead, the Commonwealth conjured up an entirely fictional set of facts, placed Simpson at the center of the narrative, and asked him to draw a legal conclusion. This neither complies with the requirements detailed in *Thomas,* nor does it conform with the requirement that lay witness testimony be based on the witness' rationally based perceptions under KRE 701. The trial court abused its discretion in allowing the Commonwealth's question.

The Commonwealth urges us to find any error in allowing the hypothetical to be harmless. It argues "since Simpson chose to go to trial and argued throughout that trial that he did not injure Helton at any time and was not responsible in any way for Helton's death, the jury would not have been surprised to hear his opinion on culpability." Appellee's Brief at 23-24. However, the Commonwealth's reasoning evades the purpose of asking the question. Using an entirely irrelevant set of hypothetical facts, the Commonwealth forced Simpson to either answer in the affirmative, conceding that if he injures a victim, even when another person had already caused a fatal injury, then he is liable for murder; or answer in the negative, as he did, to avoid such a concession. The Commonwealth could have only asked this question anticipating one of two outcomes: (1) Simpson would concede his

19

culpability for the hypothetical crime to give the jury the impression he was admitting guilt for Helton's murder, or (2) the question would elicit some emotional reaction from the jury in hearing Simpson say he did not think he would be culpable for shooting someone in the face. This was not harmless error.

On remand, the Commonwealth must refrain from asking questions requiring a witness to comment on the credibility of other witnesses or draw legal conclusions.

### 3. The trial court did not err by denying Simpson's motion for directed verdict.

Simpson claims the trial court should have granted his motion for directed verdict because the Commonwealth failed to prove all elements of wanton murder beyond a reasonable doubt. When deciding a motion for directed verdict

> [t]he trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

*Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991). On appeal, this Court will reverse only if we find "under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt[.]" *Id.* (citation omitted).

20

A person is guilty of murder when "he wantonly engages in conduct which creates a grave risk of death to another person and thereby causes the death of another person." KRS 507.020(1)(b).

> A person acts wantonly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

KRS 501.020(3). However, "mere wantonness" is insufficient to convict someone of murder. *Brown v. Commonwealth*, 174 S.W.3d 421, 425 (Ky. 2005). Instead, the defendant "must have had a more egregious mental state" under "circumstances manifesting extreme indifference to human life." *Id.* (citation omitted). The requirement of extreme indifference to human life "elevates wanton homicide to the same level of culpability as intentional homicide." *Id.* The question of whether a defendant's conduct demonstrates extreme indifference to human life must be answered by the trier of fact. *Brown v. Commonwealth*, 975 S.W.2d 922, 924 (Ky. 1998) (citation omitted).

Simpson argues the Commonwealth did not prove he manifested an extreme indifference to human life. We disagree. The Commonwealth must prove the following characteristics of the defendant's actions: "(i) homicidal risk that is exceptionally high; (ii) circumstances known to the actor that clearly show awareness of the magnitude of the risk; and (iii) minimal or non-existent social utility in the conduct." *Brown,* 174 S.W.3d at 427 (citation omitted).

21

First, viewing the evidence in the light most favorable to the Commonwealth, Simpson repeatedly assaulted a man who appeared to be so intoxicated that he was barely able to stand. Helton's face was bloodied. He suffered extensive injuries, including multiple broken bones and hemorrhaging in his brain. A reasonable juror could find that this shows an exceptionally high risk of homicide.

Second, Simpson was present when Helton was slurring his words and barely able to stand, making him appear nonthreatening to Penick. He could see Helton from inside Michaud's apartment as he laid unconscious on the balcony. Later, after he threw Helton out of the apartment two more times, Simpson knew Helton had been lying on the balcony for more than a half hour when he chose to slam his head against the floor. A reasonable juror could find Simpson was clearly aware of the magnitude of the homicidal risk.

Third, while Simpson asserts Helton was using slurs and threatening Michaud, he and Michaud primarily complained that he would not leave the apartment. Helton lived in the apartment with Michaud. Simpson did not. He was, at most, an acquaintance of Michaud. On this basis, a reasonable juror could find there was minimal or non-existent social utility in Simpson's conduct. Considering these factors, the Commonwealth sufficiently demonstrated an extreme indifference to human life to survive Simpson's motion for directed verdict.

Simpson further claims the Commonwealth failed to meet its burden because the jury was required to make inference upon inference to convict him.

22

The Commonwealth is not required to meet its burden through direct evidence alone. A conviction can be supported by circumstantial evidence. *Berry v. Commonwealth*, 680 S.W.3d 827, 838 (Ky. 2023) (citation omitted). Jurors may draw "reasonable inferences from such evidence." *Dillingham v. Commonwealth*, 995 S.W.2d 377,380 (Ky. 1999) (citation omitted).

In this case, viewing the evidence in the light most favorable to the Commonwealth, there was sufficient evidence to survive Simpson's motion for directed verdict. Based on the video evidence and testimony of the witnesses, a reasonable juror could find that Simpson caused at least some of Helton's injuries. Because Dr. Maines testified that all of Helton's injuries collectively caused his death, it is sufficient that a reasonable juror could believe beyond a reasonable doubt that Simpson caused some injury. For this reason, Simpson was not entitled to a directed verdict.

**4. We need not address the merits of Simpson's remaining arguments.**

Simpson argues the trial court erred in admitting cumulative and prejudicial photos of Helton's body from the crime scene and the autopsy. At trial, the court admitted 102 photos of Helton's body. Simpson objected to eight photos. On appeal, he requests review for abuse of discretion of the trial court's decision to admit those eight photos over his objections, and palpable error review of admission of thirty photos to which he did not object at trial. Because other grounds necessitate reversal and Simpson's arguments regarding the photos are largely unpreserved, we decline to address their merits. However, because we are remanding this matter for retrial and the Commonwealth is

23

likely to request admission of some or all the photos, we note that, when considering admission of such evidence, the trial court cannot conduct the KRE 403 balancing test "in a vacuum." *Hall v. Commonwealth*, 468 S.W.3d 814, 824 (Ky. 2015). Instead, the court must consider *each* photo "within the full evidentiary context of the case, giving due regard to the other evidence admitted as well as evidentiary alternatives, so as to ascertain each item's 'marginal' or 'incremental' probative worth for purposes of weighing that value against the risk of prejudice posed by the evidence." *Id.* (citations omitted).

Because other grounds mandate reversal for a new trial, we need not address the merits of Simpson's argument regarding cumulative error.

<u>**CONCLUSION**</u>

Based on the foregoing, the judgment of the Kenton Circuit Court is hereby reversed, and this matter is remanded for a new trial consistent with this opinion.

All sitting. Lambert, C.J.; Bisig, Conley, Nickell, and Thompson, JJ., concur. Keller, J., concurs in result only.

COUNSEL FOR APPELLANT:

Sarah D. Dailey
Assistant Public Advocate


COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Jenny L. Sanders
Assistant Attorney General