# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: OCTOBER 23, 2025
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2024-SC-0028-MR

JERRY BOGGESS          APPELLANT

ON APPEAL FROM MUHLENBERG CIRCUIT COURT
V.          HONORABLE BRIAN W. WIGGINS, JUDGE
NO. 23-CR-00140

COMMONWEALTH OF KENTUCKY          APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

Following a jury trial in which the jury convicted Jerry Boggess of committing multiple counts of sexual abuse and sodomy against his step-grandchild N.G. (child), the Muhlenberg Circuit Court sentenced Jerry Boggess to a total of thirty years of incarceration. Boggess appeals, arguing that reversible errors occurred during his trial. Although errors occurred, the preserved errors were harmless, and the unpreserved errors were not palpable. Accordingly, reversal for a new trial is unwarranted.

## I. FACTUAL AND LEGAL BACKGROUND

Child, who had recently turned twelve-years-old, lived with her maternal grandmother and her step-grandfather, Boggess. Child's grandmother and Boggess had lived together for sixteen years before they married in February 2022.

On February 12, 2023, at child's belated birthday party, law enforcement was called to their home in Greenup, Kentucky for an unruly subject and possible sexual assault. Child told family members that Boggess began sexually abusing her when she was seven years old, and that she had video evidence to support her accusations, but her family members did not believe her.

The brief video presented as evidence by child (the bedroom video) depicted Boggess shirtless on the bed in his room, touching child's body. The footage is ambiguous as to whether something inappropriate occurred as certain actions were blocked by child's body or happened "off screen." Still screen shots taken from the video which were admitted into evidence showed that Boggess's hand was moving up child's inner thigh but did not definitively show whether he touched her vaginal area. In child's initial statements to the police and a social worker, she accused Boggess of touching her vagina, which she called her goose in the video and also of having committed various other acts of inappropriate sexual contact toward her. According to Detective Chris Flener's testimony, this video evidence led to his decision to seek charges against Boggess.

Child was temporarily removed from her home, placed with another relative, and then later placed with her biological mother. Although child's relatives were warned against discussing the situation with child, there was evidence they did not honor this request.

In her child advocacy center (CAC) interview, child made the following detailed allegations: (1) Boggess would touch and penetrate her vagina with his finger every morning before school; (2) Boggess made her give him oral sex for the return of her phone; (3) Boggess made her give him oral sex in the garage; (4) Boggess sucked on her breasts; (5) Boggess sucked on her vagina; and (6) child was touched inappropriately according to the video evidence presented by child at her twelfth birthday party.

On April 14, 2023, Boggess was charged by indictment with five counts of first-degree sexual abuse, victim less than twelve years of age, and three counts of incest, victim less than twelve (12) years of age. On October 20, 2023, two counts of sexual abuse were dismissed with prejudice. On October 30, 2023, the Court amended the indictment to change the counts relating to incest to sodomy in the first-degree, victim less than twelve (12) years of age. This change was warranted because Boggess had not been child's step-grandfather until after those alleged events occurred.

Child was brought by her mother to a meeting with the prosecutor, and presented a letter to him stating she lied about the initial allegations she made against Boggess. This letter[1] was admitted into evidence at the trial:

Date: 7-7-2023

Dear [Prosecutor],

I [child's first and last name] has something to say about Jerry Boggess I lied about him touching me inapropret I was just mad because he wouldn't help me clean my room so I took my camrea in the room and while he was tickling me i videoed it to make it

---

[1] This letter is transcribed exactly as written with child's errors.

3

look like it. im sorry I lied I just didnt want to clean my room bye myself.

sincerly
[child's first and last name],

Later during that meeting, when child met separately with the prosecutor and the victim advocate, child stated that the letter was a lie.

At trial, the bedroom video was the centerpiece of the Commonwealth's case against Boggess. The trial court granted the Commonwealth's motion to treat child as a hostile witness. Child stated that she had lied and had never been touched inappropriately but admitted to making the statements regarding the abuse during her CAC interview. These prior CAC interview statements were used to impeach her trial testimony and as substantive evidence. Child testified that in the video Boggess was tickling her and not touching her inappropriately. She testified she made the allegations because Boggess did not help her clean her room and the details she provided were based on the *Fifty Shades of Grey* film series. Boggess testified that in the video he was tickling child and he had never engaged in any inappropriate contact with child.

There was no physical evidence and therefore, the jury primarily had to determine what the bedroom video depicted, whether child was telling the truth at trial, or whether child was telling the truth in her previous statements. Other evidence included jailhouse phone calls between Boggess, his wife, and child's mother, and Boggess's statement to the police.

The jury returned a verdict finding Boggess guilty of three counts of sexual abuse in the first-degree (two counts for a victim less than twelve years

4

of age and one for victim less than sixteen years of age)[2] and three counts of sodomy in the first-degree, victim less than twelve years of age. The jury recommended sentences of five years on all of the sexual abuse counts, twenty years on all of the sodomy counts, and that all the sodomy counts and one of the sexual abuse counts be run concurrent, and the two other sexual abuse counts be run consecutive, for a total of thirty years of incarceration. The trial court sentenced Boggess in accordance with this recommendation and also imposed the statutorily required five years of conditional discharge.

Boggess appeals to this Court as a matter of right.

## II. ANALYSIS

Boggess argues the following trial errors occurred: (1) the trial court erred when it declared child a hostile witness when she recanted and allowed the Commonwealth to ask leading questions that went beyond impeachment into testimony; (2) the trial court erred when it allowed the Commonwealth to elicit interpretation of an ambiguous video and unclear audio recordings; (3) the prosecutor's questions about his personal conversation with child were improper; and (4) the errors amounted to cumulative and reversible error.

Regarding the claimed errors which were preserved by contemporaneous objection, we review the trial court's evidentiary rulings for abuse of discretion. *Boyd v. Commonwealth,* 439 S.W.3d 126, 129 (Ky. 2014). The trial court

---

[2] The count for sexual abuse in the first degree, victim less than sixteen years of age, was for Boggess's conduct at child's birthday party (which was partially recorded in the bedroom video) which occurred after child's twelfth birthday.

5

abuses its discretion when its decisions are arbitrary, unreasonable, unfair, or unsupported by sound legal principles. *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999). However, "[a] non-constitutional evidentiary error may be deemed harmless . . . if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error." *Winstead v. Commonwealth*, 283 S.W.3d 678, 688-89 (Ky. 2009).

We review the non-preserved errors under the palpable error standard provided in Kentucky Rules of Criminal Procedure (RCr) 10.26: "A palpable error which affects the substantial rights of a party may be considered . . . by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error."

**A. The Trial Court did not Err in Allowing the Commonwealth to Treat Child as a Hostile Witness and in Allowing the Admission of her Prior Inconsistent Statements into Evidence.**

At trial the defense was sure child would recant when she testified based on its opening statement; the defense stated that the jury was going to hear testimony from child herself that: the sexual abuse did not happen, she told the police it did because she was mad at Boggess, she is sorry, they were just playing a game they usually play, and he did not touch her private parts.

The Commonwealth asked child various preliminary questions. After establishing when child stopped living with her grandmother and Boggess, the following two exchanges took place:

6

| Com[3]: | Do you remember what was going on that day? |
|---|---|
| Child: | I told a lie that I shouldn't have told because my grandparents would not help me clean my room. |
| Com: | Well, um, I was just talking about what was going on in your life that day. |

. . . .

| Com: | Do you know why you don't live with your Mamaw and Papaw anymore? |
|---|---|
| Child: | Because I told a lie. |
| Com: | Do you know why you are here today? |
| Child: | Because I told that lie, and then I told the truth and we're trying to figure out which one's the truth. |

These two exchanges with the Commonwealth confirmed that child's testimony would support Boggess as the defense had anticipated.

The Commonwealth then asked permission to treat child as a hostile witness. The trial court asked if defense counsel had any issue with that and the defense answered: "I'm not sure we've necessarily gotten there yet, but I'm sure it's coming." Thus, defense counsel only suggested that the motion was premature (rather than unwarranted). The trial court granted the Commonwealth's request to declare child a hostile witness and the Commonwealth proceeded to use leading questions to question child's account.

The Commonwealth questioned child about the statements she made in her CAC interview, intermittently playing portions of the interview for child.

---

[3] The Commonwealth.

This included child agreeing during the interview that she would tell the truth. Each time, child confirmed that her previous statements were false.

Substantially later during child's testimony (after child had been questioned about the statements she made at the CAC regarding Boggess penetrating her vagina with his finger, and being made to perform oral sex on Boggess in his room and in the garage, and the Commonwealth was beginning to ask child about telling the CAC that Boggess had sucked on her breasts and performed oral sex on her), the defense objected on a variety of grounds to the way the Commonwealth was questioning child, including that child should not have been declared a hostile witness. The trial court again determined that the answers child provided to the questions posed by the Commonwealth, in which she stated that her prior statements were not true, were sufficient to establish child as a hostile witness.

### 1. It was Proper to Treat Child as a Hostile Witness where she Recanted her Previous Statements at Trial.

The Kentucky Rules of Evidence (KRE) 611(c) states that "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony." However, KRE 611(c) establishes an exception to this general rule: "When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions."

As noted in *Tamme v. Commonwealth*, 973 S.W.2d 13, 27 (Ky. 1998), "the proscription against leading questions is not absolute" and "judgments will not be reversed because [the trial court allowed the use] of leading questions

8

unless the trial judge abused his discretion and a shocking miscarriage of justice resulted." Where it is obvious that the Commonwealth's own witness is hostile to the prosecution, the trial court may properly exercise its discretion "by invoking the familiar rule permitting a hostile witness to be examined as if upon cross-examination." *Brown v. Commonwealth*, 440 S.W.2d 520, 524 (Ky. 1969). Treating such a witness as a hostile witness, serves "to promote the orderly proceeding of the trial so that competent evidence [can] be elicited from the reluctant witness[.]" *Id.*

Here, by repudiating her prior statements which supported the prosecution of Boggess, child became a hostile witness. All statements made by child after this motion was granted support child's status as a hostile witness. We are satisfied that the trial court did not abuse its discretion in allowing the Commonwealth to treat child as a hostile witness and ask her leading questions.

### 2. Any Misleading or Inaccurate Leading Questions Asked of Child Did Not Result in Palpable Error.

Boggess connects his claimed error of the trial court's ruling that child could be treated as a hostile witness as prejudicing him based on certain questions that were asked of child about her previous statements, which resulted in her admitting she had previously made such statements.

Since we have determined that the trial court did not err in permitting the Commonwealth to treat child as a hostile witness, we must conclude that Boggess's objections on that basis did not preserve any claim of error as to the inaccuracy of certain leading questions asked of child. While some of the

9

Commonwealth's questions may have been unartfully worded and the

Commonwealth may have interpreted ambiguous language in a manner

favorable to the Commonwealth, without any specific objections being made to

those questions, they may only be reviewed for palpable error at this juncture.

We further note that Boggess had the opportunity to clarify any misleading

testimony by child on cross-examination, but failed to examine her about her

admissions to statements that she may not have actually made or whether any

of her statements were misinterpreted by the Commonwealth as summarized

through its questions.

KRE 613(a) provides the method for questioning a witness as to prior

statements:

> Before other evidence can be offered of the witness having made at
> another time a different statement, he must be inquired of
> concerning it, with the circumstances of time, place, and persons
> present, as correctly as the examining party can present them;
> and, if it be in writing, it must be shown to the witness, with
> opportunity to explain it.

Our Court has noted that *Cole v. State,* 65 Tenn. 239 (1873), provides the

best rationale behind this process:

> Where it is intended to impeach the witness by proving that he
> made statements out of court contrary to what he has testified in
> court, the witness should be asked whether he said or declared
> that which it is proposed to prove by the impeaching witness, that
> he did say or declare, and the time and place and person to whom
> the declaration was made should be stated in the question.

> The object of the question is to contradict him, and it is but fair to
> the witness to refresh his recollection as to the declaration or
> words used and proposed to be proved, and also by stating time,
> place and other circumstances calculated to refresh his memory.

*Noel v. Commonwealth,* 76 S.W.3d 923, 930 (Ky. 2002) (overruled on other grounds by *Mason v. Commonwealth,* 559 S.W.3d 337, 341–42 (Ky. 2018)) (quoting *Cole,* 65 Tenn. at 241 (citations omitted)).

The Commonwealth properly complied with this rule by asking child with specificity about the prior statements she made during the CAC interview. Once she denied such statements were true, the Commonwealth showed her the video of what she had previously stated, asked if she had in fact made such statements, and gave her an opportunity to explain the contradictions. When child confirmed that she had made such statements, but continued to state that she had lied then, impeachment with her prior inconsistent statements was appropriate.

These prior inconsistent statements were also admissible as substantive evidence under the *Jett* rule[4] as codified by KRE 801A. *Shepherd v. Commonwealth,* 251 S.W.3d 309, 322 (Ky. 2008); *Thurman v. Commonwealth,* 975 S.W.2d 888, 893–94 (Ky. 1998); *Porter v. Commonwealth,* 892 S.W.2d 594, 596 (Ky. 1995).

KRE 801A(a) provides in relevant part:

Prior statements of witnesses. A statement is not excluded by the hearsay rule, even though the declarant is available as a witness, if the declarant testifies at the trial or hearing and is examined concerning the statement, with a foundation laid as required by KRE 613, and the statement is:

(1) Inconsistent with the declarant's testimony[.]

---

[4] *Jett v. Commonwealth,* 436 S.W.2d 788 (Ky.1969). *See Askew v. Commonwealth,* 768 S.W.2d 51, 56 (Ky. 1989) (explaining the *Jett* rule).

11

As explained in *Thurman,* "even if the Commonwealth's 'primary purpose' in calling [child] as a witness had been to impeach her with her prior inconsistent statements, the evidence contained in those statements was not 'otherwise inadmissible.'" *Thurman,* 975 S.W.2d at 894 (quoting *United States v. Morlang,* 531 F.2d 183 (4th Cir. 1975)). However, just as in *Thurman,* we will not assume that the Commonwealth in calling child did so with the purpose of impeaching her so that her prior inconsistent statements could be admitted rather than having her testify truthfully[5] about what Boggess had done to her. *Id.*

As to the specific instances when Boggess states that suggestive leading questions resulted in child agreeing to more damning actions than were on the video of her CAC interview, we disagree that most of these questions were improper.

### a. Boggess Pushing his Finger "Up to the Bottom Knuckle"

The Commonwealth asked child if during her CAC interview she said Boggess "would stick his finger in [her] goose all the way up to the bottom knuckle" and she agreed that she said that. The basis for this question was child's description of the vaginal touching and digital penetration which would occur while she was in Boggess's bedroom in the mornings before school when

---

[5] The prosecutor in continuing to prosecute the case must have had a good faith basis for believing that child's statements confirming that sexual abuse occurred (given on the day of her birthday party, at her CAC interview, and in the Commonwealth Attorney's office the day she brought in the recantation letter) were true statements, and her repudiation in the letter and at trial were false statements.

her grandmother was outside with child's brother, waiting with him for the bus to arrive.

When asked to describe the digital penetration of her vagina, child explained: "He would stick his hand—his hands are big—he would take this finger [child indicates the index finger on her right hand, touching the base of it with her other hand] and he would stick it all the way up in me and I would push him off because it hurt[.]"

In clarifying this statement, the following exchange took place between the CAC interviewer and child:

CAC: He takes that hand, which is the right hand, right?

Child: Uh-huh. Right.

CAC: And he takes the right hand and goes in your pants.

Child: Yeah.

CAC: And you said he takes his whole finger, which is the finger you showed me.

Child: Yeah.

CAC: Okay. And are you saying inside of your goose, is that what you are saying?

Child: Yes.

CAC: Okay. And when he would put it inside you, what would he do with his finger when he put it inside of you?

Child: He would shove it there until it got right here [indicating the base of her right index finger] and then he'd push it out because it hurt[.]
. . . .

13

CAC: And his right hand is in your pants and his whole finger is going inside of you.

Child: Yeah.

Any penetration by Boggess with a part of his body into child's vagina constituted sexual abuse regardless of how deeply she was penetrated. In fact, such conduct constituted first-degree rape.

KRS 510.040 provides that "(1) A person is guilty of rape in the first degree when: . . . (b) He engages in sexual intercourse with another person who is incapable of consent because he: . . . 2. Is less than twelve (12) years old." KRS 510.010(8) defines "sexual intercourse" as "includ[ing] penetration of the sex organs of one person *by any body part*" and specifies that "[s]exual intercourse occurs upon *any penetration, however slight*[.]" (Emphasis added).

The question of penetration was irrelevant for the charged offense of sexual abuse in the first degree. KRS 510.110 provides: "(1) A person is guilty of sexual abuse in the first degree when: . . . (b) He or she subjects another person to sexual contact who is incapable of consent because he or she: . . . 2. Is less than twelve (12) years old" or "(c) Being twenty-one (21) years old or more, he or she: 1. Subjects another person who is less than sixteen (16) years old to sexual contact[.]"

KRS 510.010(7) defines "sexual contact" in relevant part as:

[M]ean[ing] the touching of a person's intimate parts or the touching of the clothing or other material intended to cover the immediate area of a person's intimate parts, if that touching can be construed by a reasonable person as being done: (a) For the purpose of sexual arousal or gratification of either party; [or] (b) For a sexual purpose[.]

14

Penetration of any amount is irrelevant to the crime of sexual contact as that is not an element of that crime. Therefore, the depth to which Boggess inserted his finger was immaterial.

Having watched the CAC interview played for child before the question was asked, it appears that child is pointing to the base of her right index finger both times. However, even if her gesture was more generally to her hand, child also specifically stated that Boggess "would stick it all the way up in me" and agreed with the characterization that Boggess's "whole finger is going inside of you."

"All the way up" and "whole finger" can reasonably be interpreted to mean Boggess's finger penetrated child to the point where this finger met Boggess's hand, which would be the same as "up to the bottom knuckle" of his finger. Even if the characterization of "up to the bottom knuckle" was suggested by the leading question and not child's exact phrasing, this was not an unreasonable interpretation of child's gesture toward her finger and conversation at the CAC.

### b. Boggess Screaming when He Received Oral Sex

Child admitted to stating at the CAC interview that Boggess made her give him oral sex by making her suck his "man private" to get her phone back. Boggess argues that it was a mischaracterization for the Commonwealth to ask whether when she started to "suck it" that Boggess "screamed" and that child instead said he was "grunting" on the CAC video. The Commonwealth, after reviewing the CAC video regarding child's statement that she gave Boggess oral

sex in exchange for getting her phone back, had the following exchange with child:

Com: Now isn't it true as well that when you would start to suck it, Papaw Jerry would scream or make noises.

Child: He didn't, no.

Com: Okay.

Child: We didn't even do anything.

Com: You did tell the child advocacy center that he would scream, right?

Child: Yes.

Having reviewed the CAC video that was played for child, child did indeed state that Boggess would scream when she started to give him oral sex.

CAC: And when you, when he made you start to suck it, what happened?

Child: He would scream.

CAC: He would scream. Tell me about that.

Child: Like he would say, "keep doing it[.]"

We also note that a mischaracterization of child's prior statement if made in good faith would not have even prejudiced Boggess in that his exact reaction to receiving oral sex was not relevant to whether he committed the underlying crime. KRS 510.070(1) specifies: "A person is guilty of sodomy in the first degree when: . . . (b) He engages in deviate sexual intercourse with another person who is incapable of consent because he: . . . 2. Is less than twelve (12) years old." KRS 510.010(1) defines "deviate sexual intercourse" as including "any act of sexual gratification involving the sex organs of one person and the

16

mouth . . . of another[.]" Screaming is not necessary to establish that Boggess had child engage in the act for "sexual gratification."

### c. Taking Longer to Examine Child about her Prior Statement than the Time It Took her to Make her Prior Statement

Child admitted to stating that Boggess made her perform oral sex on him in the garage. Boggess argues on appeal that it prejudiced him to allow the Commonwealth to examine child about this statement in a manner that took longer than when she talked to the CAC about what occurred. There is no error in the Commonwealth choosing to examine child carefully about every detail of this statement, which made the questioning take longer than the child's original statement about this conduct, especially where child repeatedly denied that this event had taken place but admitted that was what she had told the CAC and the Commonwealth was trying to make the point that child had given a lot of details about this supposedly made-up event.

### d. Characterizing Child as Saying During the CAC Interview that Boggess had Performed Oral Sex on her More than One Time

Boggess argues that the Commonwealth harmed him by asking child a question that was not supported by the evidence, namely that she told the CAC that Boggess had performed oral sex on her more than one time, to which she responded "yes." We agree that this mischaracterization was not supported by the evidence. In fact, in her interview to the CAC, when asked if Boggess had sucked on her "goose" one time or more than one time, child responded "one time."

17

However, Boggess fails to establish this error prejudiced him, let alone constituted manifest injustice under the palpable error standard. Child had also detailed that many other acts of abuse had happened over many years, stating in her CAC interview that this had been going on since she was six or seven years old. So, this mischaracterization was unlikely to have much of an impact considering that child admitted that she had told the CAC that Boggess had penetrated her vagina with his finger in the mornings before school and at night when he tucked her into bed and made her give him oral sex on more than the occasions for which she provided a detailed account. Additionally, the Commonwealth did not linger on this mischaracterization or emphasize it. Therefore, the suggestion that there was at least one additional uncharged act, while in error, had little potential for prejudicing him. Accordingly, this untruth does not satisfy the palpable error standard.

### e. Mischaracterizing Child's Previous Statement as Being that Boggess Was Going to Tell the Police He Was Trying to Tickle Her

Boggess argues that child was asked questions that mischaracterized what her statements were to the child advocacy center regarding Boggess's statement as to what he was doing during the bedroom video. Child stated during her CAC interview that "he [Boggess] tried to tickle me, is what he told the police, but he tried to go for my goose but I wouldn't let him, so I pushed him off." Later child stated to the CAC that Boggess touched her vagina through her clothing.

The Commonwealth asked child about this prior statement as follows:

Com:          [Y]ou did tell the child advocacy center that he was trying to tickle you, right?

Child:         Yeah.

Com:          Or you told the child advocacy center, you told the police, he was going to tell the police he was trying to tickle you.

Child:         Yes.

Child's CAC interview statement did not include child communicating that Boggess ever expressed an intent to her that he planned to lie to the police with a prefabricated answer.

We agree that there was not a good faith basis for such a question, and this question was therefore inappropriate as not grounded in child's previous statement. We also agree that this statement implied that Boggess was aware of his guilt and trying to cover it up through a premeditated lie. However, Boggess does not suggest that the Commonwealth engaged in prosecutorial misconduct by deliberately asking a misleading question to try to gain a conviction.

As is true of all such questions, Boggess never objected to this question and also failed to question the child further during cross-examination to clarify what she said and what she meant.

Therefore, we must examine whether asking a leading question which called for the child to answer falsely by confirming she made a statement that she did not in fact make, constituted palpable error. While the statement child confirmed she made, that Boggess had a plan to answer falsely that he was

19

tickling her, does not in fact conform to her previous statements, its likelihood of harming Boggess's defense was actually quite small. Either the jury was going to believe that child's previous statements of abuse were true, or her recantation and Boggess's account was true. The case simply did not hinge on whether Boggess had formulated a plan of how to lie that he told child about, or he simply spontaneously lied when questioned by police. Therefore, while clear error occurred when the Commonwealth asked child this question and she confirmed she made a statement she did not in fact make, such error did not constitute palpable error.

While clear error occurred regarding the two leading questions which resulted in confirmatory answers that were not supported by child's previous statements, no manifest injustice was thereby established.

**B. It was Error to Allow Video and Audio Narration and Interpretation by Persons without Personal Knowledge, but Such Error Did Not Constitute Reversible Error.**

Boggess seeks review of narration and interpretation provided regarding three different recordings played for the jury: the bedroom video, audio of his police interview, and audio of his jail phone calls.

As to the bedroom video, Boggess argued narration was inappropriately provided during the opening statement, during Detective Flener's testimony, and during child's testimony. As to the audio of his police interview and jail phone calls, which were both played during Detective Flener's testimony, Boggess argues that Detective Flener should not have been allowed to interpret incomprehensible audio content.

20

Regarding whether such narrative interpretation of the video and audio recordings was in error, this is governed by KRE 701 and KRE 602. As explained in *Morgan v. Commonwealth*, 421 S.W.3d 388, 392 (Ky. 2014):

> KRE 701 limits opinion testimony by a lay witness to that which is "[r]ationally based on the perception of the witness; [and] . . . [h]elpful to a clear understanding of the witness' testimony or the determination of a fact in issue." KRE 701(a)-(b). In addition, KRE 602 requires a witness to have personal knowledge before being allowed to testify about a subject. We have held that a lay witness "may not *interpret* audio or video evidence, as such testimony invades the province of the jury, whose job is to make determinations of fact based upon the evidence." *Cuzick v. Commonwealth*, 276 S.W.3d 260, 265–66 (Ky. 2009) (emphasis in original). "It is for the jury to determine as best it can what is revealed in the tape recording without embellishment or interpretation by a witness." *Gordon v. Commonwealth*, 916 S.W.2d 176, 180 (Ky. 1995).

Therefore, how or if a witness can properly testify about a video or audio recording will depend upon whether the witness actually witnessed the recorded events as they were occurring and has personal knowledge of them, as is required for proper lay opinion testimony, or is merely interpreting them from the recording (in which case the jury can draw its own inferences from the recording and the opinion testimony is unnecessary). *See Davidson v. Commonwealth*, 548 S.W.3d 255, 258-59 (Ky. 2018) (relying on Robert G. Lawson, *Kentucky Evidence Law Handbook* § 6.05[2][c], 417 (5th ed. 2013) and 7 John Henry Wigmore, *Evidence in Trials at Common Law* § 1917 (4th ed. 1978)). A witness may properly narrate events that the witness perceived in real time which are also depicted on a video. *Boyd v. Commonwealth*, 439 S.W.3d 126, 131 (Ky. 2014).

21

Where a witness testifies to an event that the witness did not perceive in real time, that part of the witness's narration violates KRE 602 and KRE 702, because it exceeds the witness's personal knowledge based on the witness's own perception. *McRae v. Commonwealth*, 635 S.W.3d 60, 70 (Ky. 2021); *Davidson*, 548 S.W.3d at 258; *Boyd*, 439 S.W.3d at 131–32. However, such error may be harmless if the jury watched the video or heard the audio recording and could interpret the source material independently from the witness's testimony interpreting the recording, thus providing "fair assurance that the judgment was not 'substantially swayed by the error.'" *Boyd*, 439 S.W.3d at 32 (quoting *Winstead*, 283 S.W.3d at 388).

A police officer who investigates a crime may appropriately offer lay witness testimony which explains the relationship between different items of evidence in the context of how the officer investigated what occurred. *McRae*, 635 S.W.3d at 70.

**1. The Bedroom Video**

In total, the bedroom video was played nine times: once in opening, four times with child, once with Detective Flener, three times with Boggess, and once in closing. Boggess argues that the narrative interpretation of the video— by the Commonwealth during opening statements, by Detective Flener during his testimony, and by child during her testimony—was in error. Boggess states he objected to this narration during opening statements and during Detective Flener's testimony, thus preserving that issue those times, and seeks palpable error review for the narration during child's testimony.

22

While Boggess makes general complaints about the number of times the bedroom video was played to the jury, he did not object to the number of times the video was played at trial by the Commonwealth (for being cumulative or otherwise) and he does not raise this as an issue for appellate review. Boggess fails to argue on appeal that this "piling on" of repeatedly playing the bedroom video was in error and prejudiced him. The inordinate emphasis placed on the video and the playing of it numerous times appears to be inappropriate. However, as that is not the basis of Boggess's appeal, we only consider whether the narration and interpretation of this video was in error under the relevant standards of review.

### a. Opening Statement

Prior to opening statements, the trial court properly instructed the jury that opening statements are not evidence.

In its opening statement, the Commonwealth explained that Boggess had been engaging in inappropriate sexual contact with child, detailed what this conduct entailed, and explained that child knew something had to change and made a video on the day of her twelfth birthday party. When the Commonwealth stated it would play child's video for the jury, Boggess objected to this display of evidence during opening statements. During their sidebar, defense counsel stated that "I think certainly he [the prosecutor] is allowed to outline what he believes the contents of the video are[.]" Defense counsel explained that he did not think the video could be showed because it was not

23

yet in evidence but agreed that it would be admitted into evidence later.[6] After the trial court overruled the objection due to both sides agreeing that there was no question as to whether the bedroom video would be entered into evidence, the Commonwealth played the full video.

Boggess objected to the Commonwealth's subsequent interpretive commentary when the Commonwealth stated: "And as you saw, the defendant reaches his hand toward [child's] vagina."

The defense counsel argued "that's not what the video shows[,]" "he's making one conclusory statement[,]" and "he's interpreting what this video is showing[,]" and he's "describing it incorrectly." The trial court overruled this objection on the basis that the Commonwealth could properly provide an outline of what the evidence shows and was not moving into argument.

Once the Commonwealth's opening statement resumed, the Commonwealth stated: "The defendant stuck his hands between [child's] legs, touching her vagina. You see on the video, defendant's hand."

The Commonwealth attempted to re-play a specific portion of the footage but was stopped by the trial court who instructed "we need to move on."

The Commonwealth proceeded to describe its interpretation of the video footage:

> In the video you see the defendant's hand go down and touch [child's] vagina, which she refers to as her "goose." You can see as [child] moves her wrist, the defendant turned his hand, and there, the defendant's hand is on [child's] vagina in the bottom left-hand corner of the screen. Then the defendant pulls his hand away,

---

[6] The video was in fact introduced into evidence during child's testimony.

> [child] closes her legs and pulls them together. Yet, the defendant was not finished. He tried to grab [child's] breasts. [Child] attempted to get the defendant off of her. Finally, the defendant then raises up and motions for [child] to go on.

The defense made no additional objections to these statements.

In the defense's opening statement, it described how Boggess and child had a good relationship, commonly engaged in "horse-play" which would be corroborated by the testimony of child's family members, and focused on her admission that she had made up the allegations of abuse and would testify that it never happened. The defense then provided its own interpretation of what the video depicted, that it "showed them [Boggess and child] playing around."

"The purpose of opening statement is to outline for the jury what the proponent expects his proof to be." *Parker v. Commonwealth*, 241 S.W.3d 805, 808 (Ky. 2007). *See* RCr 9.42. "The parties are granted wide latitude in making their opening statements, in part, because what is said in opening statement is not evidence. However, that latitude is not limitless, and a party should avoid discussing matters that are not admissible." *Jefferson v. Eggemeyer*, 516 S.W.3d 325, 338 (Ky. 2017) (internal citation omitted).

> While there is certainly the temptation to advance one's argument at the beginning of the trial so that the jury understands not only what the testimony is expected to be, but the proponent's theory of the case as well, this is not the intent of opening statement, and pushing the envelope results in error[.]

*Parker,* 241 S.W.3d at 808.

25

Our Court has allowed prosecutors to display admissible items of real evidence to the jury during opening statement as noted in *Fields v. Commonwealth*, 12 S.W.3d 275, 281 (Ky. 2000), and demonstrative materials as noted in *Parker*, 241 S.W.3d at 808. However, "when evidentiary materials are used [in opening statements], they must at least be authenticated or their admissibility determined before their use. Likewise, commentary should be linked to that which can be supported by the evidence reasonably expected to be admitted." *Id.* at 809.

Prior to opening statements, the trial court correctly instructed the jury that opening statements are not evidence. While the Commonwealth explained its theory of what had occurred in the video and the defense provided its own theory, it was the evidence that followed at trial which the jury was to rely upon in making its decision. Boggess does not intimate that the jury failed to follow the trial court's instruction to not consider the opening statements as evidence.

The parties agreed that the bedroom video was admissible and would come into evidence; it did in fact come into evidence without the defense making any objection to it during child's testimony. We are not satisfied that it was proper for the bedroom video to be played during the Commonwealth's opening statement. However, this error was ultimately harmless as the video was admitted into evidence and the parties depicted in the video testified and made statements about the incident depicted by the video.

26

Playing video evidence *and* then arguing about the inferences to be gleaned from it goes far beyond what is proper for an opening statement. However, the defense only objected to one statement the Commonwealth made about what the bedroom video depicted, that the video showed Boggess reaching toward child's vagina. The defense's objection to this statement is well taken. The video footage was ambiguous as to what was occurring, and the Commonwealth was making an argument about the inferences that could be drawn from the footage and stating those inferences as established fact. The trial court erred when it permitted the Commonwealth to make such a "closing argument style" conclusion in its opening statement.

Boggess also argues that other statements the Commonwealth made about the bedroom video after his objection was overruled were also in error. They include the even more damning statements that the video showed Boggess touching child's vagina and having his hand on child's vagina (rather than merely reaching toward it). Boggess's prior objection did not preserve an objection to these later statements which went far beyond the Commonwealth's previous statement.

However, we conclude that as to the preserved error, the Commonwealth's statement was ultimately harmless and as to the unpreserved errors, the Commonwealth's statements did not constitute palpable error. The presentation of the evidence included: the video; still shots from the video that the Commonwealth purported established that Boggess touched child's vagina through her clothing; the testimony of child and Boggess, who were the two

27

people who were present and depicted on the video, and who both had personal knowledge about what occurred when the video was being filmed; and child's and Boggess's prior statements about what occurred. The jury had sufficient evidence to able to decide for itself what the video depicted, how it supported or did not support specific count tied to the events depicted and the other the allegations, and what occurred on that occasion that was not memorialized by the video.

### b. Detective Flener's testimony

During Detective Flener's testimony, the Commonwealth asked him if he had seen the video presented by child. Detective Flener responded affirmatively. The prosecutor then stated he would show the video to Detective Flener.

Prior to the video being played, defense counsel objected to Detective Flener offering any interpretation of the video as the video itself was the "best evidence." The Commonwealth argued that Detective Flener had to review the video as part of his investigation in deciding to bring charges. While the trial court expressed reservations regarding the showing of the video, the trial court concluded that the Detective Flener could state what he thinks the video shows and permitted the Commonwealth to proceed.

After the Commonwealth showed the video to Detective Flener and began to question him, the trial court had counsel approach and cautioned the Commonwealth to limit its questions to how seeing the video led to the bringing of charges. The following exchange then took place:

28

Com:        Based on your review of that video, what did you believe had occurred as far as contact between the defendant and the victim [child] here?

Flener:      It appeared that Mr. Boggess motioned for her to come over to get on the bed beside him. He reached his hand up between her knees, up on her inner thigh and grabbed her vaginal area.

Com:        Is that what led you to seek the charges in this case?

Flener:      Yes.

The Commonwealth then introduced a series of still pictures taken from screen shots of the video for identification and Detective Flener confirmed they were accurate stills from the video and described them as showing how Boggess began to touch child, with his arm going up her leg or inner thigh area through to her vaginal area. The photos were then admitted.

It was appropriate for the Commonwealth to ask Detective Flener about the video and the still photographs for purposes of establishing why he chose to bring charges. Had he merely stated that reviewing these materials lent support to child's allegations, leading him to file charges, that would have been permissible. What was unwarranted was to allow Detective Flenner to state what he thought the bedroom video showed, specifically allowing him to opine that it showed Boggess touching child's vaginal area. It was the province of the jury to decide what the video showed. Yet this specific testimony did not result in another objection.

Detective Flener did not have any personal knowledge about what was depicted in the video.

29

Having reviewed this evidence, the video and the screenshots show that Boggess had his hand near the general area of child's crotch, but it is unclear whether he touched her inappropriately or instead only had his hand on her leg and her lower abdomen. This evidence was not definitive and instead could support varied inferences about what conduct it was depicting.

As with the similar statement provided by the Commonwealth during its opening statement, we conclude that Detective Flener should not have been allowed to opine that the bedroom video showed Boggess was touching child's vaginal area. This error, to the extent it was preserved, was ultimately harmless; this error, to the extent it was not preserved, did not constitute palpable error as the jury could judge for itself what the video depicted.

### c. Child's Testimony

Throughout child's testimony, the Commonwealth played the bedroom video four times, asking her to confirm what the video depicted through leading questions backed up by her prior inconsistent statements. Boggess argues that the Commonwealth exceeded the bounds of questioning child about her prior statements and any inconsistencies with her current recantation testimony when it "inserted an interpretation of the video into the questioning" and requests palpable error review.

The examples that Boggess provides are that "the Commonwealth asked if [child] hesitated going back because she was afraid that Jerry would touch her vagina[,]" "used freeze frame images to interpret that Jerry's hand was on [child's] vagina at exact moments when [child's] original statement was not

30

specific as to any exact moment when touching occurred," and "sought to contradict [child's] testimony by playing a short isolated clip."

These examples occurred in the course of the Commonwealth's detailed questioning of child about her prior statements and what the video showed. Child denied that her previous statements to the CAC about this incident were true, and instead stated that Boggess was tickling her thighs, under her thighs and her bellybutton, rather than putting his hand on her vagina and going for her breasts as she had previously stated. These series of detailed questions, backed up by still photos from the video, were appropriate to clarify child's statements. How child was reacting in the video could cast doubt on her recantation.

Child testified that she set out to fabricate "fake evidence" that Boggess was touching her because she was mad that he would not help her clean her room and explained "I knew he was going to tickle me like he does every morning so I figured I could make it look like he was touching me when he was not."[7]

Child, as a party to the events recorded in the video, could certainly interpret the actions depicted on the video and what was happening at that time, whether captured in the video footage or not. The Commonwealth could

---

[7] Boggess also comments about inappropriate commentary regarding the video during the Commonwealth's closing argument, in which the Commonwealth claims to hear child gasp. This is not raised as a specific error, and furthermore, great latitude is permitted in closing arguments, including to make inferences from the evidence presented.

31

properly question her about those events to try to examine her for any inconsistencies in her current account. Additionally, Boggess testified and gave his own interpretation of the events depicted and what was really going on during this time. The jury saw the bedroom video and had still photographs from the video. Because the jury could properly judge what was depicted therein, these questions regarding what could be inferred from the video certainly do not constitute palpable error. It was properly left for the jury to judge what had occurred given all the evidence before it.

## 2. Audio of Boggess's Police Interview

Boggess seeks palpable error review of Detective Flener's interpretation of Boggess's police interview, arguing that many portions of the audio recording of the interview were incomprehensible and playing portions of the audio and then asking Flener to interpret and summarize the conversation was inappropriate.

Detective Flener was the person who interviewed Boggess. He thus had personal knowledge of what occurred. The playing of the audio was used to refresh his recollection of the questions that were asked and how Boggess answered them. The audio recording was also introduced into evidence.

While the sound quality on the recording as memorialized on the video record of the trial was poor,[8] we disagree with Boggess that many portions of

---

[8] The audio recording of this interview should have been of better quality when listened to in-person by the jury, than when it was played in the courtroom and recorded second-hand for appellate review. However, we were unable to compare the audio quality of the recording itself, as though it was admitted into evidence it is not in the physical record before us on appeal. We observe, however, that the audio quality of

the audio recording were incomprehensible. However, to the extent that they were, yet the audio refreshed Detective Flener's recollection, he could appropriately testify about what he remembered occurred. The defense could have also questioned Detective Flener further about the accuracy of his summaries. Additionally, Boggess testified about the interview, too, and provided his recollection of what occurred. Finally, as the audio was admitted into evidence, the jury could judge for itself whether Detective Flener or Boggess accurately summarized the interview. There is no palpable error under these circumstances.

### 3. Audio of Boggess's Jail Phone Calls

Boggess seeks palpable error review of Detective Flener's interpretation of Boggess's jail phone calls, arguing that this prejudiced him because the jury had to rely upon Detective Flener's interpretation because the recorded statements were largely unintelligible. In this instance, Detective Flener did not hear these calls as they occurred but instead reviewed the recordings later.

We agree that it was clear error to allow Detective Flener to interpret these phone calls, but we disagree that manifest injustice resulted from this error. While we agree that it was difficult to make out who was speaking and what they were saying on these audio recordings as memorialized in the video recording of his testimony, we observe that these recordings were admitted into evidence. Having reviewed the recordings as entered into evidence, it was easy

---

the jail phone calls in evidence when directly played is far superior to the trial video record in which they were played to the jury.

to understand all of the persons who were speaking as the quality was much better in that format. Therefore, the jury should have been able to hear the recordings much better at the trial when they were played directly to the jury. This makes Detective Flener's interpretation of less importance, as does the fact that he was cross-examined about his interpretations, and that Boggess also testified about the phone calls.

While the jury should have been allowed to judge for itself what was said during the recorded phone calls rather than be given an interpretation by a witness who did not hear the phone calls as they were taking place, the jury had the opportunity to listen to the audio of the phone calls for itself and judge how they should be interpreted. While allowing Detective Flener to interpret the contents of the calls was clear error, Boggess has failed to establish that reversal is warranted because allowing such interpretation resulted in manifest injustice to him.

## C. The Prosecutor Erred in Acting as a Witness in Asking Child Questions about Their Personal Conversation, but this Error was Not Palpable.

Boggess argues that he is entitled to a reversal of his conviction because the prosecutor committed prosecutorial misconduct by acting as a witness while questioning child about a personal conversation which took place on July 7, 2023, when child gave him the letter and met privately with him and the victim advocate. Boggess seeks palpable error review.

The prosecutor questioned child twice about her visit to his office. Specifically, child was questioned about whether she remembered "coming into my office" and having a meeting with "myself and Miss Marla Laycock in my

34

office" and what child said at that meeting. Child indicated initially that she did not remember telling the prosecutor and Laycock that everything child "told law enforcement, social services, and the child advocacy center, . . . was true[.]" Then child admitted "I did, but you scared me."

Child also admitted to remembering talking to the prosecutor and victim advocate about the paper she had brought the prosecutor and remembered stating to them that "this was hard on [her] family[.]"

Later, near the end of child's testimony, the prosecutor asked child additional questions about this meeting between the prosecutor, Laycock and child, specifically about being asked whether the statement in the letter or in her previous statement to the police, the social workers, and the child advocacy center was true, and being asked to pick an option between the two. Child admitted to telling them that "what [she] put in the letter was not true," and that "[she] had been pressured into writing that letter[.]" When asked an open-ended question about why child had "[told] me and Miss Laycock . . . that what you wrote in the letter was not true[,]" child indicated that she answered that way "[b]ecause you were screaming at me and you scared me" and "my mom could hear you in the front of the building."

The prosecutor's repeated questioning of child about matters in which he had personal knowledge, based on his previous conversations with child, was highly inappropriate and a violation of the Kentucky Rules of the Supreme Court (SCR), the Kentucky Rules of Professional Responsibility, specifically SCR 3.130(3.4)(e), which prohibits lawyers while in trial from acting to "assert

35

personal knowledge of facts in issue except when testifying as a witness" and SCR 3.130(3.7) which prohibits lawyers from acting as advocates in a trial in which such a lawyer is likely to be a necessary witness in most circumstances. Furthermore, the prosecutor's assertion of facts from his prior conversation with child also violates KRE 603 and KRE 802 as explained in *Holt v. Commonwealth*, 219 S.W.3d 731, 737 (Ky. 2007), because the prosecutor was unsworn and testifying as to hearsay. As noted in *Fisher v. Commonwealth*, 620 S.W.3d 1, 13 (Ky. 2021): "Deliberate violations of these rules, depending on how deliberate and effective they are, can amount to prosecutorial misconduct and might require reversal."

Asking about events to which the prosecutor and victim advocate had personal knowledge, rather than having other counsel question child, made this prosecutor a witness as to what his questions indicated had occurred. Perhaps the prosecutor should have withdrawn from representing the Commonwealth so that he could be called as a witness, but at minimum, someone else should have questioned child regarding these events.

As in *Dillon v. Commonwealth*, 475 S.W.3d 1, 19-20 (Ky. 2015), the prosecutor erred by introducing his own interaction with child in an attempt to impeach her, thus improperly becoming a witness, in violation of more than 125 years of Kentucky precedent. While child ultimately agreed she had made the statements he attributed to her, this method of questioning child based on his own personal knowledge in violation of these rules would make Boggess's convictions subject to reversal had the error been preserved.

However, we conclude, based upon *Dillon*, that while the prosecutor's impeachment "testimony" regarding his prior conversation with child was error, and he should have certainly known better, his conduct did not constitute palpable error because it had little substantive effect on the case as a whole. *Id.* at 21-22. Simply put, this exchange was a small portion of the trial and does not rise to the level of constituting manifest injustice, where child had made her position clear that she had lied every time she previously stated that the abuse occurred, and that her recantation in the letter and during her testimony was her telling the truth. Child's previous statements as to all the incidents were well established by her recorded CAC interview answers and how she had previously answered the prosecutor in telling him that those prior statements were true was concomitantly of less importance as it was part of a larger narrative and did not break much "new ground."

## D. No Cumulative Error Occurred.

Finally, Boggess seeks reversal for cumulative error. We have before us preserved errors that were harmless and unpreserved errors that did not rise to the level of constituting manifest injustice. The cumulative error doctrine provides that "multiple errors, although harmless individually, may be deemed reversible if their cumulative effect is to render the trial fundamentally unfair. We have found cumulative error only where the individual errors were themselves substantial, bordering, at least, on the prejudicial." *Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky. 2010).

37

While it is a close issue, having considered all the errors that occurred we do not conclude that they rendered Boggess's trial fundamentally unfair.

### III. CONCLUSION

We affirm Boggess's conviction and sentences by the Muhlenberg Circuit Court. While Boggess did not receive a perfect trial, he received a fair trial. *See McDonald v. Commonwealth*, 554 S.W.2d 84, 86 (Ky. 1977). Ultimately, it was up to the jury to determine what occurred based on the evidence before it, and this was exactly what the jury did in convicting Boggess of the crimes with which he had been charged.

All sitting. Lambert, C.J.; Bisig, Conley, Goodwine, Keller and Thompson, JJ., concur. Nickell, J., concurs in result only.

COUNSEL FOR APPELLANT:

Jennifer Wade
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Matthew R. Krygiel
Assistant Attorney General